STATE OF NORTH CAROLINA v. CHARLES MARVIN PARKER

No. 9227SC30

(Filed 3 August 1993)

1. **Evidence and Witnesses § 2333 (NCI4th)— rape and incest case—doctor qualified as expert in detection of child abuse and trauma—no error**

The trial court did not err in qualifying a doctor as an expert "in the field of pediatrics and in the area of the detection of child abuse and trauma," where the witness was a board certified pediatrician who had served as a child medical examiner for the State for a dozen years, had examined over 400 abused and neglected children, and had testified in the North Carolina courts on the subject of child abuse and neglect on numerous occasions.

**Am Jur 2d, Evidence § 5.**

2. **Evidence and Witnesses § 2331 (NCI4th)— expert medical witness—opinion that victim had been sexually abused— admission error**

In a prosecution of defendant for rape, first-degree sexual offense, and incest where credibility was the central issue, the trial court committed prejudicial error in allowing an expert medical witness to testify over defendant's objection that in his opinion the victim had been sexually abused, since the witness based his opinion only on his interview with the victim in which she related a history of sexual abuse and the fact that her hymenal ring was not intact, and there was thus nothing in the record to support a conclusion that the witness was in a better position than the jury to determine whether the victim was sexually abused.

**Am Jur 2d, Expert and Opinion Evidence § 244.**

Appeal by defendant from judgments entered 2 August 1991 by Judge Zoro Guice, Jr. in Gaston County Superior Court. Heard in the Court of Appeals 11 February 1993.

On 6 November 1989, defendant was indicted for one count of rape and one count of sexual offense, and on 8 April 1991, defendant was indicted for one count of first degree sexual offense,

one count of rape, and two counts of incest. These cases were joined for trial. On 2 August 1991, a jury found defendant guilty of all charges. Judge Zoro Guice, Jr. entered judgments and sentenced defendant to two life terms. From these judgments, defendant appeals.

> *Attorney General Lacy H. Thornburg, by Assistant Attorney General Melissa L. Trippe, for the State.*

> *Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Mark D. Montgomery, for defendant-appellant.*

ORR, Judge.

This case arises out of acts that allegedly occurred between defendant and his minor daughter, (whom we shall refer to as T.P. due to her young age). At trial, T.P. testified to four incidents of sexual acts which occurred between her and defendant. T.P. testified that on 9 February 1985, she went with defendant to the hospital to visit defendant's wife (T.P.'s stepmother), Kelly Parker. At this time, according to the evidence, T.P. was ten years old. T.P. testified further that after visiting Kelly Parker she and defendant walked back to the car where defendant asked her if she would take off her pants. T.P. asked defendant why, and he said, "Are you going to give me a little bit." T.P. pulled down her pants, and defendant told her to bend over. Defendant then engaged in anal intercourse with her.

T.P. also testified that on 4 July 1987 when, according to the evidence, T.P. was twelve years old, defendant and Kelly Parker got into an argument while driving in defendant's truck. T.P. and three other children were also riding in the truck. When defendant stopped the truck, Kelly Parker got out and took two of the children out of the truck before defendant drove off with T.P. and one of T.P.'s stepsisters. When they got home, defendant told T.P. to take her clothes off and get into the bed with him. After T.P. took off her clothes and got into bed with defendant, defendant fondled her breasts and had vaginal intercourse with her.

Further, T.P. testified that on 9 March 1989 when, according to the evidence, T.P. was fourteen years old, she and defendant were alone on the couch in the living room when defendant pulled out his penis and told her to play with it. After T.P. touched

defendant's penis, he told her to perform oral sex, which T.P. did. Then on 18 March 1989, when T.P.'s stepmother was absent from the home, defendant had vaginal intercourse with her in one of the bedrooms. T.P. also testified that the first time she told anyone of these incidents was on 2 April 1989 when she told her boyfriend's stepmother and Kelly Parker while they were at the Carolina Speedway.

Defendant testified, however, that he has never been sexual with T.P. More specifically, defendant testified that he has never had oral, anal, or vaginal sexual relations with T.P. Defendant also testified to the specific allegations T.P. made against him. Defendant testified that in February 1985, Kelly Parker was in the hospital and that he did visit her, but that as far as he could recall, T.P. never accompanied him on those visits. Defendant denied having sexual relations with T.P. on 9 February 1985 in the parking lot of the hospital.

Further, defendant testified that on 4 July 1987, he and Kelly Parker got into a fight while they were out at the Moose Lodge. After they left the Moose Lodge in defendant's truck, they continued to fight until Kelly Parker told defendant to let her out of the truck. Defendant stopped the truck, and Kelly Parker got out, taking two of the four children with her. Defendant then drove to Mary and Mitchell Hilton's house where defendant told the Hiltons about the fight. The Hiltons asked defendant if he wanted them to follow him to his house, and defendant said he did because he was "liable to get locked up" and he wanted someone to watch the kids. The Hiltons arrived at defendant's home, and Mary Hilton stayed with defendant until the next morning to look after the kids. Defendant denied having sexual relations with T.P. and testified that the only thing he did with regard to T.P. that night was to tell her to put her younger sister to bed. Additionally, defendant denied that any sexual relations occurred between him and T.P. on 9 March 1989 or on 18 March 1989.

Defendant also presented evidence that questioned the credibility of T.P. and Kelly Parker. T.P. was dating Chad Hawkins in 1989, and defendant testified that Kelly Parker was dating Chad's brother, Buddy. Kelly Parker also testified that she dated Buddy. The evidence shows that both T.P. and Kelly were friends with the stepmother of Chad and Buddy, Mary Hawkins. Defendant testified that on 1 April 1989, the day before T.P. first told anyone

about these sexual acts, he told T.P. that she could not see Chad Hawkins anymore. He also testified that he told T.P. that he did not want her to have a relationship with anyone in the Hawkins family, nor did he want anyone in the Hawkins family in his home. After these statements to T.P., defendant testified that Kelly Parker, Bud Hawkins (Buddy's father), and Mary Hawkins told him that they would get even with him. Further, according to defendant, after he told T.P. that she could not see Chad Hawkins, T.P. did not want to speak to him or even be near him. On 3 April 1989, defendant spoke to Kelly Parker's mother who accused him of sexually molesting T.P.

Defendant's parents also testified at trial that before defendant's marriage to Kelly Parker, his relationship with T.P. seemed to be that of a normal father-daughter relationship, but that after defendant and Kelly Parker married, T.P.'s demeanor changed. T.P. began drinking some and cursing and, according to defendant's father, lying. Further, defendant testified that after his marriage to Kelly Parker, he was unable to talk to T.P. because of Kelly. He testified that Kelly told him that he was "a lot older than" her and that he would "be in a wheelchair or probably a rocking chair pretty soon" and that she and T.P. would "get out" and "have a good time." Defendant's sister also testified that before Christmas, 1988, Kelly Parker told her that she had a plan to fix defendant so that she could leave him and he could not see his children again.

On 21 April 1989, Dr. Carlos Fisher examined T.P. after T.P. told Kelly Parker that defendant had sexually abused her. The trial court qualified Dr. Fisher as an expert witness "in the field of pediatrics and in the area of the detection of child abuse and trauma." At trial, Dr. Fisher testified over defendant's objection, that in his opinion, T.P. "had been sexually abused over a long period of time based on [his] exam."

Based on all of the evidence, the jury found defendant guilty of all of the acts charged against him. From these judgments, defendant appeals.

I.

[1] First, defendant contends the trial court erred in qualifying Dr. Fisher as an expert in the "detection of child abuse and trauma." We disagree.

At the outset, the State argues that defendant has waived his right to object to the qualification of Dr. Fisher as an expert in the "detection of child abuse and trauma" by failing to object at trial.

An objection to a witness's qualifications as an expert in a given field or upon a particular subject is waived if it is not made in apt time upon this special ground, and a mere general objection to the content of the witness's testimony will not ordinarily suffice to preserve the matter for subsequent appellate review.

State v. Hunt, 305 N.C. 238, 243, 287 S.E.2d 818, 821 (1982). Due to the serious crime involved and the substantial penalty imposed, however, we have elected in our discretion to consider the merit of defendant's contention. See, id. at 244, 287 S.E.2d at 822 (where our Supreme Court elected to hear the merits of defendant's contention that an expert witness invaded the province of the jury when defendant failed to object to the testimony at trial and the defendant was found guilty of first degree murder and sentenced to life in prison).

Before the trial court qualified Dr. Fisher as an expert "in the field of pediatrics and in the area of the detection of child abuse and trauma", he testified to his extensive work in the field of pediatrics. Dr. Fisher testified that he graduated from the University of North Carolina School of Medicine in Chapel Hill in 1969 and completed his four-year pediatric training and program of internship at North Carolina Memorial Hospital. He was a member of the Child Evaluation Program on the Maltreatment Committee at Memorial Hospital for two years during his training. He is practiced and licensed and also board certified in pediatrics. Further, he has served as a child medical examiner for the State of North Carolina since 1977. He also serves on a committee in Gastonia similar to the Maltreatment Committee he served on at Memorial Hospital, and he has examined over four hundred children who have been abused and neglected. Finally, Dr. Fisher has testified in North Carolina superior and district courts on the subject of child abuse and neglect on numerous occasions.

"Whether a witness has the requisite skill to qualify as an expert in a given area is chiefly a question of fact, the determination of which is ordinarily within the exclusive province of the trial court." State v. Goodwin, 320 N.C. 147, 150, 357 S.E.2d 639, 641

(1987). Further, " '[a] finding by the trial judge that the witness possesses the requisite skill will not be reversed on appeal unless there is no evidence to support it.' " *State v. Parks*, 96 N.C. App. 589, 592, 386 S.E.2d 748, 750 (1989) (citation omitted).

Applying these standards to the testimony of Dr. Fisher's credentials as an expert, we conclude that the trial court did not err in qualifying Dr. Fisher as an expert "in the field of pediatrics and in the area of the detection of child abuse and trauma."

II.

[2] Next, defendant contends that the trial court erred in allowing Dr. Fisher to testify, over defendant's objection, that in his opinion T.P. had been sexually abused. Based on the holding in *State v. Trent*, 320 N.C. 610, 359 S.E.2d 463 (1987), we agree.

In *Trent*, the defendant was convicted of first degree rape and taking indecent liberties with a minor. At trial, the minor victim testified to specific instances of sexual abuse which occurred between her and defendant. Defendant testified on his own behalf and denied the allegations. The State also introduced the testimony of Dr. Markello as an expert in the field of medicine with a specialty in pediatrics. Dr. Markello had examined the victim and interviewed her specifically with regard to her allegations of sexual abuse.

Dr. Markello testified that the victim told him that

her father had treated her for a rash on her thigh when she was about ten years old, that he had at that time begun to touch her private parts and breasts and continued to do so even after the rash disappeared, and that he had had sexual intercourse with her. Dr. Markello said that the victim also told him about moving back to Virginia to live with her grandmother in the summer of 1981 and returning to Greenville in September of 1984, when, according to the victim, the touching, but not the sexual intercourse, began again. The victim told Dr. Markello that she attempted to commit suicide in July of 1985 but was not treated for the attempt.

*Id.* at 613, 359 S.E.2d at 465. Further, Dr. Markello testified that another physician conducted a pelvic exam of the victim and found that the victim's hymen was not intact. The exam did not, however, show any lesions, tears, abrasions, bleeding or otherwise abnormal conditions.

The prosecuting attorney then asked Dr. Markello if he had a diagnosis based on his interview of the victim and the physical exam. Over defendant's objection, Dr. Markello replied, "The diagnosis was that of sexual abuse." *Id.* On appeal, defendant assigned as error the admission of this testimony.

Our Supreme Court recited the applicable law for admitting expert testimony. "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." *Id.* at 614, 359 S.E.2d at 465; N.C.R. Evid. 702. Further,

in determining whether expert medical opinion is to be admitted into evidence the inquiry should be ... whether the opinion expressed is really one based on the special expertise of the expert, that is, *whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.*

*Trent, supra* (emphasis added).

The Court stated that its review of the record showed that Dr. Markello based his opinion solely on the results of the pelvic exam and the history of sexual abuse given to him by the victim. Further, the Court stated that the pelvic exam was conducted four years after the date of the offenses and only revealed that the victim's hymen was not intact. The Court stated, "Given the limited basis recited by Dr. Markello for his diagnosis, there is nothing in the record to support a conclusion that he was in a better position than the jury to determine whether the victim was sexually abused". *Id.* at 614, 359 S.E.2d at 466. Based on this conclusion, the Court held that this testimony was not admissible under Rule 702 and that its admission constituted prejudicial error to defendant.

In the present case, Dr. Fisher read his notes into evidence which relayed an interview he conducted with T.P. about the alleged sexual acts defendant committed against her. Dr. Fisher also testified about the physical exam of T.P. which was conducted. He stated, "The findings on examination revealed there was a vaginal discharge, a creamy sort of discharge, from the vagina. The hymenal ring was not intact." As to the vaginal discharge,

Dr. Fisher testified that it is a common complaint that adolescents have and that it can occur for non-sexual reasons.

Dr. Fisher also testified that he conducted a rectal exam of T.P. and found no lesions with sores or other evidence of disease present. He conducted tests for sexually transmitted diseases and found none. He also found no tears or scar tissue.

The prosecuting attorney then asked:

Q. Dr. Fisher, based on your interview with [T.P.] and your subsequent examination of her person, did you thereafter make a conclusion or reach a conclusion as to whether or not she had been the victim of sexual or abusive neglect?

The defendant objected to Dr. Fisher answering this question, which objection the trial court overruled. Dr. Fisher answered, "It was my opinion that she had been sexually abused over a long period of time based on my exam."

Thus, like the expert in *Trent*, Dr. Fisher based his opinion only on his interview with T.P. in which she related a history of sexual abuse and the fact that her hymenal ring was not intact. Given the limited bases for Dr. Fisher's opinion, there is nothing in the record to support a conclusion that he was in a better position than the jury to determine whether the victim was sexually abused. We hold, therefore, that it was error to admit this testimony into evidence.

We also hold that in the present case the error was prejudicial. "Defendant is entitled to a new trial if there is a 'reasonable possibility that, had the error . . . not been committed, a different result would have been reached . . . .'" *Trent*, 320 N.C. at 615, 359 S.E.2d at 466; N.C. Gen. Stat. § 15A-1443(a). The central contest in the present case is one of credibility. The record contains considerable evidence of conflict in the family arising out of defendant's second marriage to Kelly Parker and the relationship between Kelly Parker, T.P., and the Hawkins family. Further, the record contains evidence that prior to his marriage to Kelly Parker, defendant had a normal father-daughter relationship with T.P. We cannot say that, under the facts of this case, there was no reasonable possibility of a different result had the error not occurred, and defendant is, therefore, entitled to a new trial.

Based on this holding, we decline to address defendant's remaining assignments of error.

New trial.

Judges WELLS and MARTIN concur.