STEPHENS, Judge.
 

 *395
 
 Defendant William Clifton Crabtree, Sr., appeals from judgments entered upon his convictions for first-degree sexual offense against a child under the age of thirteen years, indecent liberties with a child, and
 
 *396
 
 crime against nature. Crabtree argues that the trial court plainly erred by (1) allowing three witnesses to vouch for the child victim's credibility and (2) submitting the first-degree sexual offense charge to the jury on a theory not supported by the evidence. While we agree that one of the State's witnesses impermissibly vouched for the victim's credibility, we conclude that this error did not prejudice Crabtree. We find no error in the trial court's submission of the first-degree sexual offense charge.
 

 Factual and Procedural Background
 

 The evidence at trial tended to show the following: In late April 2013, ten-year-old "L.R."
 
 [1]
 
 and her two brothers began living with her grandmother and Crabtree, the grandmother's husband of sixteen years. L.R. testified that, shortly thereafter, Crabtree, whom L.R. considered her "grandpa," began making sexual advances towards her, starting with an incident in the family's barn when Crabtree kissed L.R., inserted his tongue into her mouth, and touched her breasts. Crabtree progressed to entering her room at night to "rub his thing on" her. L.R. testified that Crabtree "rubbed his dick on my vagina and white stuff was coming out[.]" Sometimes Crabtree made L.R. put her hand on his "thing" and move it up and down. Crabtree touched the inside of L.R.'s vagina using his fingers and moving them "up and down." L.R. testified that it hurt when Crabtree's fingernails would poke her vagina and she had itching on the inside of her vagina. Crabtree also licked L.R.'s vagina.
 

 L.R. testified that this sexual abuse took place when she was home sick from school and her grandmother was at work and also on a morning following Thanksgiving. L.R. explained that, on the latter occasion, her grandmother had awakened, come to L.R.'s bedroom door, and witnessed Crabtree abusing L.R. In that incident, Crabtree used his hand to rub her vagina and then "he started licking it." According to L.R., Crabtree threatened her with foster care if she told anyone about his abuse.
 

 "D.J.," L.R.'s younger brother, who, like his sister, had known Crabtree as his "grandpa" for his entire life, testified about several instances when he saw Crabtree "do things with [L.R.] that [D.J.] thought [were] weird or strange or inappropriate[.]" D.J. testified that he witnessed Crabtree "lift up her skirt, her nightgown" while they were seated at "the eating table." On another occasion, in the family barn, D.J. saw Crabtree "do something that [he] thought was wrong to" L.R., to wit, Crabtree "had
 
 *397
 
 his hand in her pants." The third incident D.J. witnessed took place in L.R.'s bedroom:
 

 A. I saw him sitting on the edge of the bed. [L.R.] was between his legs. I didn't
 
 *712
 
 know what he was doing, but I did see that.
 

 Q. Did you know at this time what anybody was wearing when you saw that?
 

 A. Um, I think he was wearing his underwear, and she was wearing[ ] her purple nightgown.
 

 Q. Could you see anybody's body parts?
 

 A. No, I did not.
 

 Q. Could you see any private parts of anybody?
 

 A. No, I did not.
 

 Q. Okay. Now, when you saw those things that you thought were weird and wrong, did you say anything about it to anybody?
 

 A. I told my grandma.
 

 Q. When did you tell your grandma?
 

 A. Like the first time I saw it, I told her.
 

 Q. Okay. What did you say?
 

 A. That, um, I think something like that, um, he was messing with [L.R.].
 

 The grandmother testified that, on 29 November 2013, she awoke to find Crabtree was not in their shared bedroom. Looking for her husband, she walked through the house to the doorway of L.R.'s bedroom and saw Crabtree sitting on the side of L.R.'s bed with his hands between L.R.'s legs and L.R.'s hands between his legs. According to the grandmother, "[t]hey was feeling each other up[ ]" and there was no doubt in her mind that the contact was sexual in nature. The grandmother motioned for L.R. to remain quiet by placing her finger over her mouth because the grandmother wanted to "see what all he was going to do." The grandmother then quietly retreated to her bedroom, unnoticed by Crabtree, but later returned to L.R.'s bedroom and asked Crabtree what he was doing. Crabtree replied that he was "looking for a mouse." After Crabtree left the room, the grandmother spoke with L.R. about what she had just
 
 *398
 
 seen, and L.R. disclosed her past sexual abuse by Crabtree. The grandmother did not confront Crabtree, instead contacting the Person County Department of Social Services ("DSS") and local law enforcement.
 

 Several witnesses testified about the investigation into L.R.'s allegations. Later in December, the grandmother took L.R. to the emergency room ("ER") after she complained of pain and itching in her vaginal area and stated that Crabtree had engaged in intercourse with her. An ER doctor alerted the Child Abuse Medical Evaluation Clinic, an outpatient clinic affiliated with Duke University Hospital, and, on 23 December 2013, Dr. Karen Sue St. Claire, a pediatrician and the medical director of the clinic, began an evaluation of L.R. St. Claire testified as an expert witness. During her initial exam of L.R., St. Claire received L.R.'s medical history from the grandmother while Scott Snyder, St. Claire's child interviewer, interviewed L.R. about the alleged abuse. St. Claire's physical examination of L.R. revealed no physical signs of trauma or infection to L.R.'s vagina or anal area.
 

 St. Claire testified about the clinic's five-tier rating system for evaluating an alleged child victim's description of sexual abuse. St. Claire and Snyder each classified L.R.'s description as level five, the "most diagnostic" category. St. Claire testified that L.R.'s description provided a "clear disclosure" and a "clear indication" of sexual abuse. Snyder was not formally offered or accepted as an expert witness, but offered testimony about his interviews with L.R. Pertinent to this appeal, when asked on re-direct examination about L.R.'s report of a detail regarding an incident of fellatio L.R. was forced to perform on Crabtree, Snyder testified as follows:
 

 Q Is that correct? Was it remarkable to you when she described the juice hitting the roof of her mouth?
 

 A Umm, remarkable in terms of not typically something that you would hear from a ten-year-old child, and not necessarily something, again trying to understand what may be the reason the child might be saying these things. It is striking in terms of what the child may have seen something happen, but that's more of a experiential statement, in other words something may have actually happened to her as opposed to something seeing on a screen or something having been heard about.
 

 *713
 
 DSS social worker Antoinetta Royster received L.R.'s case in early December 2013 and subsequently interviewed L.R., her family members, and Crabtree. Like Snyder, Royster was neither formally offered nor
 
 *399
 
 admitted as an expert witness. Royster testified about her interviews and then was asked about the process DSS follows in abuse and neglect cases:
 

 Umm, the family had based upon the recommendations from the CME, the Child Medical Evaluation, one other evaluation was recommended, and that's called a Child Family Evaluation. And with those, it's a lot of times in the abuse and serious neglect cases where the Child Medical Evaluation look[s] more at the physical, but could be physical evidence of abuse and neglect, the Child Family Evaluation look[s] more at the emotional piece of it to basically talk with everyone in the family. And if there is any other thing, any other treatment is needed, they would recommend that to DSS for us to like move on with that, move forward in that direction. They ... also give what they, not really a diagnosis, but their conclusion or decision about those children that have been evaluated if they were abused or neglected in any way.
 

 Q So and all of those recommendations and treatments have been followed up on-
 

 A Yes.
 

 Q-as you continue to be involved in this case. Is that correct?
 

 A Yes.
 

 Captain A.J. Weaver of the Person County Sheriff's Office also testified on behalf of the State. Weaver testified about his recorded interview with L.R. on 4 December 2013. The recorded interview was introduced into evidence as State's Exhibit 3, published, and played for the jury without objection. In the recording, which was transcribed by the court reporter when it was played for the jury at trial, L.R. disclosed that Crabtree had touched her "private area" with his hands and forced L.R. to "rub" his "private." L.R. also described Crabtree pulling her pants down and licking her "private." L.R. further explained that, after playing with her "private," Crabtree would put his "private" in L.R.'s mouth, go "up and down" until "stuff start[ed] coming out" and went into L.R.'s mouth. L.R. said the latter form of abuse had happened two or three times. Weaver testified that, following his interview with L.R., he sought warrants and arrested Crabtree on 4 December 2013.
 

 On 9 December 2013, a Person County Grand Jury indicted Crabtree on three charges based on the events alleged to have occurred on
 
 *400
 
 29 November 2013: one count of first-degree sex offense against a child under the age of thirteen years, one count of indecent liberties with a child, and one count of crime against nature. Crabtree pled not guilty, and his case came on for trial at the 16 March 2015 session of Person County Superior Court, the Honorable Beecher R. Gray, Judge presiding. Following the close of the State's evidence,
 
 [2]
 
 Crabtree elected not to present any evidence. At the close of all evidence, Crabtree moved to dismiss the charges against him, and the trial court denied that motion.
 

 On 19 March 2015, the jury returned verdicts finding Crabtree guilty on all charges. The court consolidated the first-degree sexual offense against a child under the age of thirteen years and the crime against nature convictions and entered a judgment sentencing Crabtree to a term of 317-441 months. The court then entered a separate judgment sentencing Crabtree to a concurrent term of 21-35 months for the indecent liberties with a child conviction. Crabtree gave notice of appeal in open court.
 

 Discussion
 

 On appeal, Crabtree argues that (1) the trial court committed plain error in allowing St. Claire, Snyder, and Royster to vouch for L.R.'s credibility, or in the alternative, that Crabtree received ineffective assistance of counsel ("IAC") when his trial counsel failed to object to the challenged testimony; and (2) the trial court committed plain error in submitting
 
 *714
 
 the charge of first-degree sexual offense to the jury on a theory not supported by the evidence. We find no prejudicial error in the admission of the challenged testimony and no error in the submission of the first-degree sexual offense charge.
 

 I. Standard of review
 

 To preserve an issue for review on appeal, a defendant "must have presented the trial court with a timely request, objection[,] or motion, stating the specific grounds for the ruling sought if the specific grounds are not apparent." N.C.R. App. P. 10(a)(1). However,
 

 [i]n criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when
 
 *401
 
 the judicial action questioned is specifically and distinctly contended to amount to plain error.
 

 N.C.R. App. P. 10(a)(4) ;
 
 see also
 

 State v. Goss
 
 ,
 
 361 N.C. 610
 
 , 622,
 
 651 S.E.2d 867
 
 , 875 (2007),
 
 cert. denied
 
 ,
 
 555 U.S. 835
 
 ,
 
 129 S.Ct. 59
 
 ,
 
 172 L.Ed.2d 58
 
 (2008). Plain error review is limited to issues that "involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence."
 
 State v. Gregory
 
 ,
 
 342 N.C. 580
 
 , 584,
 
 467 S.E.2d 28
 
 , 31 (1996) (citations omitted).
 

 For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.
 

 State v. Lawrence
 
 ,
 
 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012) (internal quotation marks and citations omitted). Thus, "[u]nder the plain error rule, [a] defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result."
 
 State v. Jordan
 
 ,
 
 333 N.C. 431
 
 , 440,
 
 426 S.E.2d 692
 
 , 697 (1993) (citation omitted).
 

 II. Vouching for L.R.'s credibility
 

 Crabtree first argues that St. Claire, Snyder, and Royster improperly vouched for the credibility of L.R. during their testimony. We conclude that neither Snyder nor Royster improperly testified as to L.R.'s credibility. While we agree that St. Claire improperly vouched for L.R.'s credibility in the midst of otherwise acceptable testimony, we conclude that Crabtree was not prejudiced by the impermissible testimony.
 

 "[T]estimony of an expert to the effect that a prosecuting witness is believable, credible, or telling the truth is inadmissible evidence."
 
 State v. Bailey,
 

 89 N.C.App. 212
 
 , 219,
 
 365 S.E.2d 651
 
 , 655 (1988) (citations omitted). In child sexual abuse cases, where there is no physical evidence of the abuse, an expert witness's affirmation of sexual abuse amounts to an evaluation of the veracity of the child witness and is, therefore, impermissible testimony.
 
 State v. Dick
 
 ,
 
 126 N.C.App. 312
 
 , 315,
 
 485 S.E.2d 88
 
 , 89,
 
 disc. review denied
 
 ,
 
 346 N.C. 551
 
 ,
 
 488 S.E.2d 813
 
 (1997). Examples of impermissible vouching for a child victim's
 
 *402
 
 credibility include a clinical psychologist's testimony that a child victim was "believable[,]"
 
 see
 

 State v. Aguallo
 
 ,
 
 318 N.C. 590
 
 , 599,
 
 350 S.E.2d 76
 
 , 81 (1986), and an expert witness's statement, based on an interview with the child, that she "was a sexually abused child."
 
 See
 

 State v. Grover
 
 ,
 
 142 N.C.App. 411
 
 , 414,
 
 543 S.E.2d 179
 
 , 181,
 
 affirmed per curiam
 
 ,
 
 354 N.C. 354
 
 ,
 
 553 S.E.2d 679
 
 (2001). "However, an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith."
 
 State v. Stancil
 
 ,
 
 355 N.C. 266
 
 , 267,
 
 559 S.E.2d 788
 
 , 789 (2002) (
 
 per curiam
 
 ) (citations omitted). Further, the same analysis applies to a witness who is a DSS worker or child abuse investigator because, even if she is "not qualified as an expert witness, ... the jury [will] most likely [give] her opinion more weight than a lay opinion."
 
 State v. Giddens
 
 ,
 
 199 N.C.App. 115
 
 , 122,
 
 681 S.E.2d 504
 
 , 508 (2009)
 
 *715
 
 ,
 
 affirmed per curiam
 
 ,
 
 363 N.C. 826
 
 ,
 
 689 S.E.2d 858
 
 (2010).
 

 Crabtree contends that Snyder and Royster, lay witnesses for the State, improperly vouched for L.R.'s credibility during their testimony. Crabtree cites Royster's statement, in explaining the process of investigating a report of child sexual abuse, that "[St. Claire and her team] give ... their conclusion or decision about those children that have been evaluated if they were abused or neglected in any way." Read in context as quoted
 
 supra
 
 in the Factual and Procedural Background of this opinion, it is clear that Royster's comment was merely a description of what St. Claire's team are expected to have done before sending any case to DSS for further evaluation. Royster was not commenting directly on L.R.'s case at all, let alone her credibility, and thus the challenged testimony was not inadmissible.
 

 Crabtree also challenges testimony in which Snyder characterized L.R.'s description of performing fellatio on Crabtree as "more of an experiential statement, in other words something may have actually happened to her as opposed to something [seen] on a screen or something having been heard about." As with Royster's remark, Snyder's testimony specifically left the credibility determination to the jury by stating, "something
 
 may
 
 have actually happened to [L.R.] as opposed to something" L.R. learned about from the media or another source. (Emphasis added). Thus, we conclude that Snyder did not improperly vouch for L.R.'s credibility.
 

 In contrast, St. Claire's testimony did include impermissible vouching. We find no fault with St. Claire's description of the five-tier rating system that the clinic uses to evaluate potential child sexual abuse victims based on the particularity and detail with which a patient gives his
 
 *403
 
 or her account of the alleged abuse. However, her statement that "[w]e have sort of five categories all the way from, you know, we're really sure [sexual abuse] didn't happen to yes, we're really sure that [sexual abuse] happened" and her reference to the latter category as "clear disclosure" or "clear indication" of abuse, in conjunction with her identification of that category as the one assigned to L.R.'s 23 December 2013 interview, crosses the line from a general description of the abuse investigation process into impermissible vouching. Likewise, St. Claire's testimony that her team's "final conclusion [was] that [L.R.] had given a very clear disclosure of what had happened to her and who had done this to her" was an inadmissible comment on L.R.'s credibility.
 

 As part of our plain error review, having concluded that the admission of these remarks by St. Claire was error, we must next determine whether they prejudiced Crabtree. After careful consideration, we conclude that they did not.
 

 This Court's opinion in
 
 State v. Ryan
 
 provides a helpful, well-reasoned framework for assessing the prejudice of an expert witness's vouching for an alleged child victim's credibility:
 

 Under our plain error review, we must consider whether the erroneous admission of expert testimony that impermissibly bolstered the victim's credibility had the prejudicial effect necessary to establish that the error was a fundamental error. This Court has held that it is fundamental to a fair trial that a witness's credibility be determined by a jury, that expert opinion on the credibility of a witness is inadmissible, and that the admission of such testimony is prejudicial when the State's case depends largely on the testimony of the prosecuting witness.
 

 Notably, a review of relevant case law reveals that [ (1) ] where the evidence is fairly evenly divided, or [ (2) ] where the evidence consists largely of the child victim's testimony and testimony by corroborating witnesses with minimal physical evidence,
 
 especially where the defendant has put on rebuttal evidence
 
 , the error is generally found to be prejudicial, even on plain error review, since the expert's opinion on the victim's credibility likely swayed the jury's decision in favor of finding the defendant guilty of a sexual assault charge.
 

 223 N.C.App. 325
 
 , 336-37,
 
 734 S.E.2d 598
 
 , 606 (2012) (citations and internal quotation marks omitted; emphasis added),
 
 disc. review denied
 

 *716
 
 ,
 
 *404
 

 366 N.C. 433
 
 ,
 
 736 S.E.2d 189
 
 (2013). In
 
 Ryan
 
 , this Court found the expert's vouching prejudicial, noting that the defendant testified, denying all of the charges, and his ex-wife also testified on his behalf, while
 

 the State's evidence consisted of testimony from the child, her family members, her therapist, the lead detective on the case who was an acquaintance of the family, and an expert witness. All of the State's evidence relied in whole or in part on the child's statements concerning the alleged sexual abuse. ... There was
 
 no testimony presented by the State that did not have as its origin the accusations of the child
 
 . For this reason, the credibility of the child was central to the State's case.
 

 Id.
 

 at 337
 
 ,
 
 734 S.E.2d at 606
 
 (emphasis added).
 
 See also
 

 State v. Bush
 
 ,
 
 164 N.C.App. 254
 
 , 260,
 
 595 S.E.2d 715
 
 , 719 (2004) ("In the case at bar, any and all corroborating evidence is
 
 rooted solely in
 
 [
 
 the victim's
 
 ]
 
 telling of what happened
 
 , and that her story remained consistent. ... Therefore, the conclusive nature of [the doctor's] testimony as to the sexual abuse and that [the] defendant was the perpetrator was highly prejudicial. This constituted plain error." (Emphasis added)).
 

 In contrast, this Court has found no prejudice to a defendant where "absent the [impermissible vouching] testimony, the ... case involve[s] more evidence of guilt against the defendant than simply the testimony of the child victim and the corroborating witnesses."
 
 State v. Sprouse
 
 ,
 
 217 N.C.App. 230
 
 , 242,
 
 719 S.E.2d 234
 
 , 243 (2011),
 
 disc. review denied
 
 ,
 
 365 N.C. 552
 
 ,
 
 722 S.E.2d 787
 
 (2012). In
 
 Sprouse
 
 , the defendant contended "that the trial court committed plain error by allowing [a] DSS social worker ... to testify that there had been a substantiation of sex abuse of [the child victim] by [the] defendant."
 
 Id.
 
 at 241,
 
 719 S.E.2d at 243
 
 . Although we agreed that the social worker's "testimony that DSS had substantiated the allegations of abuse" was error, this Court concluded that "the error [did] not rise to the level of plain error ...."
 

 Id.
 

 at 243
 
 ,
 
 719 S.E.2d at 244
 
 . In that case,
 

 [a]side from the testimony of A.B.[, the child victim,] and the witnesses corroborating her testimony, the following evidence was presented at trial: testimony by Raquel[, the defendant's wife,] that shortly after A.B. filed charges against [the] defendant, [the] defendant "manipulat[ed]" Raquel to tattoo his penis in order to "blow [A.B.'s] story out of the water"; [the] defendant asked Raquel to contact Burris[, a female acquaintance,] in an effort to get Burris
 
 *405
 
 to lie about having seen the tattoo during the time period associated with the allegations by A.B.; photographs of [the] defendant's penis, coupled with Raquel's testimony, showed that he did not have a tattoo as of 2 January 2007, despite the fact that he testified he did have the tattoo as early as 2003 or 2004; and [the] defendant tried to have A.B. killed after charges were filed against him.
 

 Id.
 

 at 242-43
 
 ,
 
 719 S.E.2d at 243-44
 
 . Thus, as in Crabtree's case, there was substantial evidence supporting the victim's abuse allegations that was independent of the victim's report.
 

 Similarly, in
 
 State v. Davis
 
 , this Court noted that "it is not plain error for an expert witness to vouch for the credibility of a child sexual abuse victim where the case does not rest solely on the child's credibility."
 
 191 N.C.App. 535
 
 , 541,
 
 664 S.E.2d 21
 
 , 25 (2008) (citation omitted). Thus, although "admission of [the challenged] statement was error as it improperly vouched for [the victim's] credibility[,]" because evidence independent of the child's account of abuse was before the jury, "we [held] that admission of this statement did not constitute plain error."
 

 Id.
 

 Here, although there was no physical evidence of sexual abuse, Crabtree presented no evidence, let alone evidence rebutting L.R.'s allegations. More importantly, unlike in
 
 Ryan
 
 and
 
 Bush
 
 , the State's entire case did not rest solely on L.R.'s account of what happened. The criminal charges against Crabtree arose from an incident that was alleged to have occurred on 29 November 2013. As noted
 
 supra
 
 , the grandmother testified that, on that date, she saw Crabtree "sitting on the side of [L.R.'s] bed, and he had his hands between [L.R.'s] legs, and [L.R.] had her hands between his legs. ... They was feeling each other up." This eyewitness
 
 *717
 
 account of Crabtree sexually abusing L.R. is entirely independent of L.R.'s reports of abuse at the hands of her "grandpa," and thus not dependent on L.R.'s credibility. Further, the grandmother also testified that she had been married to Crabtree for twenty years, had loved him during their marriage, and had a son with him. Thus, her testimony that she witnessed her own husband sexually abusing her granddaughter was likely highly persuasive to the jury.
 

 Likewise, L.R.'s brother, D.J., testified that he had seen several "weird" encounters between Crabtree and his sister, including Crabtree "lift[ing] up her skirt, her nightgown" at the dinner table; Crabtree with "his hand in her pants" in the barn; and Crabtree, in his underwear "sitting on the edge of [L.R.'s] bed. She was between his legs." While these incidents were apparently not those for which Crabtree was charged
 
 *406
 
 in this matter, D.J.'s testimony about them bolsters L.R.'s reports that Crabtree had been sexually abusing her for a period of time, and, like the grandmother's testimony, is entirely independent of L.R.'s credibility.
 

 In light of this independent evidence of Crabtree's guilt not based on L.R.'s reports of abuse, the precedent established in
 
 Sprouse
 
 and
 
 Davis
 
 compels our conclusion that "it was not plain error for [St. Claire] to vouch for the credibility of [L.R. because] the case [did] not rest solely on the child's credibility."
 
 See
 

 Davis,
 

 191 N.C.App. at 541
 
 ,
 
 664 S.E.2d at 25
 
 (citation omitted). Accordingly, Crabtree cannot show he was prejudiced by St. Claire's vouching and, as a result, has failed to establish plain error.
 

 We likewise reject Crabtree's alternative argument that he received IAC in that his trial counsel failed to object to St. Claire's vouching testimony.
 

 To prevail on a claim of [IAC], a defendant must first show that his counsel's performance was deficient and then that counsel's deficient performance
 
 prejudiced his defense
 
 .... Generally, to establish prejudice, a defendant
 
 must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different
 
 .
 

 State v. Allen
 
 ,
 
 360 N.C. 297
 
 , 316,
 
 626 S.E.2d 271
 
 , 286 (2006) (citations and internal quotation marks omitted; emphasis added),
 
 cert. denied
 
 ,
 
 549 U.S. 867
 
 ,
 
 127 S.Ct. 164
 
 ,
 
 166 L.Ed.2d 116
 
 (2006). In light of our determination that St. Claire's impermissible vouching for L.R.'s credibility was not prejudicial to him, Crabtree cannot establish the second prong of a successful IAC claim.
 

 III. First-degree sexual offense charge
 

 Crabtree also argues that the trial court committed plain error in submitting the charge of first-degree sexual offense to the jury on a theory not supported by the evidence. Specifically, Crabtree contends that there was no substantive evidence of fellatio presented at trial and, therefore, the trial court erred in instructing the jury that a sexual act for purposes of first-degree sex offense included fellatio as well as cunnilingus and penetration. We disagree.
 

 "[I]t is plain error to allow a jury to convict a defendant upon a theory not supported by the evidence."
 
 State v. Jordan
 
 ,
 
 186 N.C.App. 576
 
 , 584,
 
 651 S.E.2d 917
 
 , 922 (2007) (citations omitted),
 
 disc. review denied
 
 ,
 
 *407
 

 362 N.C. 241
 
 ,
 
 660 S.E.2d 492
 
 (2008). Thus, a defendant is entitled to a new trial when "the trial court erroneously submits the case to the jury on alternative theories, one of which is not supported by the evidence ... and ... it cannot be discerned from the record upon which theory or theories the jury relied in arriving at its verdict ...."
 
 State v. Lynch
 
 ,
 
 327 N.C. 210
 
 , 219,
 
 393 S.E.2d 811
 
 , 816 (1990) (citation omitted). However, "the testimony of a single witness will legally suffice as evidence upon which the jury may found a verdict."
 
 State v. Vehaun,
 

 34 N.C.App. 700
 
 , 704,
 
 239 S.E.2d 705
 
 , 709 (1977) (citation and internal quotation marks omitted),
 
 disc. review denied
 
 ,
 
 294 N.C. 445
 
 ,
 
 241 S.E.2d 846
 
 (1978). Further,
 

 [e]vidence of an out-of-court statement of a witness, related by the in-court testimony of another witness, may be offered as substantive evidence.... Although the better practice calls for the party offering the evidence to specify the purpose for which the evidence is offered, unless challenged
 
 *718
 
 there is no requirement that the purpose be specified.
 

 State v. Ford
 
 ,
 
 136 N.C.App. 634
 
 , 640,
 
 525 S.E.2d 218
 
 , 222 (2000) (citations and footnotes omitted).
 

 At trial, L.R. gave no testimony describing an instance in which she performed fellatio on Crabtree, and, on appeal, Crabtree asserts that "[t]he only references to fellatio were in the form of alleged out-of-court statements by [L.R.] to [the grandmother], ... St. Claire, ... Snyder, and ... Royster." However, as noted
 
 supra
 
 , the State also presented testimony from Weaver about his 4 December 2013 interview of L.R. A recording of that interview was admitted as "substantive" evidence without objection as State's Exhibit 3 and was published to the jury. The recording includes the following exchange between Weaver and L.R.:
 

 Q Has he tried to put his private area anywhere else on you?
 

 A In my mouth.
 

 Q He did. When did that happen, do you know?
 

 A My, like whenever he's done with me, he'll like take his private and go in my mouth.
 

 Q When you say done with you, what do you mean by that?
 

 A Like he's done playing, playing with me.
 

 *408
 
 Q Uh-huh.
 

 A Like in my private area, he's done playing.
 

 Q Then he'll put his private area in your mouth?
 

 A (Nods affirmatively.)
 

 Q What happens when that happens? What happens when he does that?
 

 A He'll like go up and down.
 

 Q Uh-huh. And then what happens?
 

 A It like, it's stuff starts coming out.
 

 Q In your mouth?
 

 A (Nods affirmatively.)
 

 Q Okay. All right. All right. How many times has that happened?
 

 A Like two or three.
 

 Q Two or three. Do you remember when that happened?
 

 A Umm, on the Friday morning.
 

 Q On Friday morning that happened?
 

 A Yeah, before my grandma got up.
 

 During a bench discussion with the prosecutor and defense counsel about the DVD which contained the recording and also included an interview of the victim's grandmother, the trial court clarified that, "The only part that's going to be substantive is the interview of [L.R.]." The recording was admitted without objection or limiting instruction, and the only instruction regarding the recording given by the trial court during the jury charge was that the recording could be considered "as evidence of facts it illustrates or shows." L.R.'s recorded description of Crabtree forcing her to perform fellatio on him was thus substantive evidence supporting Crabtree's conviction for first-degree sexual abuse on the basis of fellatio. Crabtree's argument is overruled, and we hold that he received a fair trial, free of prejudicial error.
 

 NO PREJUDICIAL ERROR IN PART; NO ERROR IN PART.
 

 Judge BRYANT concurs.
 

 Judge McCULLOUGH dissents in a separate opinion.
 

 McCullough, Judge, dissents.
 

 *409
 
 From the majority opinion's conclusion that an expert witness's testimony vouching for the credibility of the victim was harmless error, I dissent. As the majority acknowledges, vouching for a victim-witness's credibility is normally not permissible.
 

 Defendant argues that three witnesses improperly vouched for the credibility of L.R. in this case. We agree that the State's expert witness improperly vouched for L.R.'s credibility in the midst of otherwise acceptable testimony. However, we disagree that any other witness improperly testified as to L.R.'s credibility.
 

 "[T]estimony of an expert to the effect that a prosecuting witness is believable, credible, or telling the truth is inadmissible evidence."
 
 State v. Bailey,
 

 89 N.C.App. 212
 
 , 219,
 
 365 S.E.2d 651
 
 , 655 (1988) ;
 
 see also
 

 State v. Aguallo
 
 ,
 
 318 N.C. 590
 
 , 599,
 
 350 S.E.2d 76
 
 , 81 (1986) (a clinical psychologist's testimony as
 
 *719
 
 an expert witness that a child victim was "believable" was inadmissible). This Court has also recognized that where no physical evidence of sexual abuse exists, an expert witness's affirmation of sexual abuse of a child amounts to an evaluation of the veracity of the child witness and is, therefore, impermissible testimony.
 
 See
 

 State v. Dick
 
 ,
 
 126 N.C.App. 312
 
 , 315,
 
 485 S.E.2d 88
 
 , 90 (1997) (distinguishing the holdings in
 
 State v. Trent
 
 ,
 
 320 N.C. 610
 
 ,
 
 359 S.E.2d 463
 
 (1987) and
 
 State v. Parker
 
 ,
 
 111 N.C.App. 359
 
 ,
 
 432 S.E.2d 705
 
 (1993) ). "However, an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith."
 
 State v. Stancil
 
 ,
 
 355 N.C. 266
 
 , 267,
 
 559 S.E.2d 788
 
 , 789 (2002).
 

 The majority acknowledges that the testimony of Dr. St. Claire, in part, constituted inadmissible "vouching." At trial, Dr. St. Claire testified as the State's expert witness regarding L.R.'s interview and physical examination. As noted above, Dr. St. Claire described a five-tier rating system that the clinic uses to evaluate potential child sexual abuse victims based on the particularity and detail with which a patient gives his or her account of the alleged abuse. Upon review of Dr. St. Claire's testimony, I find no fault with Dr. St. Claire's description of the five-tier system apart from Dr. St. Claire's statement that, "[w]e have sort of five categories all the way from, you know, we're really sure [sexual abuse] didn't happen to yes, we're really sure that [sexual abuse] happened."
 

 *410
 

 See
 

 State v. Grover
 
 ,
 
 142 N.C.App. 411
 
 , 414-19,
 
 543 S.E.2d 179
 
 , 181-83 (2001) (an expert witness's conclusion, based only on an interview with the child and with no physical evidence, that "[she] was a sexually abused child" was impermissible testimony). Dr. St. Claire and her team refer to the latter category as "clear disclosure" or "clear indication" and assigned L.R.'s 23 December 2013 interview at the clinic to this category. To be exact, their "final conclusion [was] that [L.R.] had given a very clear disclosure of what had happened to her and who had done this to her."
 

 In cases involving alleged sexual abuse of a child, there is a fine line between expert testimony properly evaluating a diagnosis of the child witness and expert testimony that improperly vouches for the credibility of the child witness. Had Dr. St. Claire not supplemented her description of the five-tier rating system with the comment that a "clear disclosure" signifies near certainty as to the sexual abuse of the child, no improper vouching for the credibility of the child witness would have occurred. However, by testifying that the team is near certain that sexual abuse has occurred when a child's allegations are classified in the "clear disclosure" tier and then testifying that L.R.'s interview was classified as a clear disclosure, Dr. St. Claire effectively testified that the team was near certain that L.R. had been sexually abused. I believe that this testimony crosses that delicate line and amounts to vouching for L.R.'s credibility. Because the State's evidence almost entirely relies on L.R.'s testimony and the corroborative testimony of other witnesses, it is likely that Dr. St. Claire's testimony caused the jury to rely on Dr. St. Claire's opinion of L.R.'s disclosure rather than reach its own conclusion as to the credibility of L.R.'s testimony at trial. Thus, I believe Dr. St. Claire's testimony regarding the certainty of sexual abuse occurring had a probable impact on the jury finding the defendant guilty of first degree sexual offense against a child under the age of thirteen years, indecent liberties with a child, and crime against nature.
 

 The majority recognizes that this portion of Dr. St. Claire's testimony is inadmissible, but concludes that the sexual activity observed by the victim's grandmother along with observations made by the victim's brother provide such overwhelming evidence of guilt that the admission of the expert's improper vouching testimony is harmless beyond a reasonable doubt. I recognize that vouching for the victim's credibility is not always plain error and can be harmless error when the other evidence in the case is very strong.
 
 See
 

 State v. Hammett
 
 ,
 
 361 N.C. 92
 
 ,
 
 637 S.E.2d 518
 
 (2006) and
 
 State v. Stancil
 
 ,
 
 355 N.C. 266
 
 ,
 
 559 S.E.2d 788
 
 (2002).
 

 *720
 

 *411
 
 In the case
 
 sub judice
 
 , however, without the grandmother's and brother's observations there might not have been a conviction, even with the inadmissible expert witness testimony. This victim was an admitted liar. She admitted to lying about sexual activity in order to live with her aunt who would let her do what she wanted. On cross examination L.R. testified as follows:
 

 Q. What grade did you say you were in?
 

 A. Fourth.
 

 Q. What type of grades do you get?
 

 A. Eighties and Nineties and one hundreds.
 

 Q. And have you been told you're pretty smart?
 

 A. Yes.
 

 Q. You said it's more important to tell the truth?
 

 A. Yes.
 

 Q. And you talked to Investigator Weaver about this case; is that correct?
 

 A. Yes.
 

 Q. Do you remember talking to him about 6 months before?
 

 A. Yes.
 

 ....
 

 Q. Do you remember talking to them another time about 6 months before?
 

 A. Yes.
 

 Q. Did you tell them that your brothers had raped you?
 

 A. Yes.
 

 Q. Was that the truth or a lie?
 

 A. A lie.
 

 Q. Do you know why you told it?
 

 A. Yes.
 

 Q. Can you tell us why you told that lie?
 

 *412
 
 A. So, I could go and live with somebody else.
 

 Q. That would have been your Aunt Delilah?
 

 A. Yes.
 

 Q. And you loved her a lot?
 

 A. Yes.
 

 Q. Was she your grandmother's sister?
 

 A. Yes.
 

 Q. Did she let you do whatever you wanted?
 

 A. Yes.
 

 Q. Did you like doing that?
 

 A. Yeah.
 

 Q. Now, you had recently moved in with your grandmother, Mildred. Is that right?
 

 A. Yes.
 

 Q. But you didn't like living there so much, did you?
 

 A. Yeah, because of the horses.
 

 Q. You liked the horses.
 

 A. (No response).
 

 Q. But did you tell Officer Weaver that you didn't like all the rules?
 

 A. Yeah.
 

 Q. But you liked living with Aunt Delilah because she let you do what you wanted?
 

 A. Yes, but not all the time.
 

 Q. Not all the time. Okay. And do you remember talking to officers in February of that year, a few months before you talked to Officer Weaver?
 

 A. No.
 

 Q. Do you remember telling the officer in Durham that a black man had had sex with you, too?
 

 *413
 
 A. Yes.
 

 Q. Was that a truth or a lie?
 

 A. A truth.
 

 Q. That was the truth?
 

 A. (Witness nods yes).
 

 Q. Do you know what officer you told? Do you remember who you told about that?
 

 A. No.
 

 Q. Okay. But that was a few months before you talked with Officer Weaver?
 

 A. Yes.
 

 Q. Okay. Does your step-grandfather, Mr. Crabtree, have any physical problems that you know about?
 

 A. Yes.
 

 Q. Can you tell us what they are?
 

 A. Um, my grandma said that he was mentally crazy.
 

 Q. Do you know if he had a heart attack?
 

 A. Yes.
 

 Q. Do you know if he had cancer ?
 

 *721
 
 A. No.
 

 Q. Were you able to tell if he had a hard time walking?
 

 A. Yes.
 

 Q. Did he sometimes have a hard time walking?
 

 A. Yes.
 

 Q. Were you able to tell if he had a hard time with his hands sometimes?
 

 A. No.
 

 Q. You couldn't tell it was hard for him to grab ahold of things?
 

 *414
 
 A. No.
 

 Q. Okay. Do you ever remember him having a job?
 

 A. Yeah.
 

 Q. What was his job?
 

 A. Um, cutting wood. Trees.
 

 Q. Was that a long time ago?
 

 A. No.
 

 Q. Is that a few years ago?
 

 A. No.
 

 Q. Was it before he had the heart attack?
 

 A. I guess.
 

 Q. Pardon?
 

 A. I guess.
 

 Q. Okay. You don't live with your grandma, Mildred, any more. Is that right?
 

 A. Yes.
 

 Q. Why is that?
 

 A. Because, um, she couldn't take care of us no more.
 

 Q. Okay. Did you tell people things about her?
 

 A. Yes.
 

 Q. Were they true or were they a lie?
 

 A. Some were a lie.
 

 Q. Why did you tell those lies?
 

 A. Because I didn't want to live with her no more.
 

 Q. So, is it fair to say you told lies in the past when you wanted to move somewhere else?
 

 A. Yes.
 

 With a child under the age of 13 testifying that she had actually accused her own brothers of rape, just to go live with an aunt who had
 
 *415
 
 few rules presents the prosecutor with a very difficult situation. The observations of the grandmother and brother are helpful but they do not constitute a first degree sex offense although they clearly provide sufficient evidence to sustain the indecent liberties charges. Thus, L.R.'s statement about fellatio which is the basis of the first degree sex offense charge depends solely on L.R.'s credibility. Of course, the jury could conclude that any person who would do what the grandmother observed probably did everything else. I prefer to believe that jurors do not jump to such assumptions and base their verdict on the evidence actually introduced at trial.
 

 Consequently, I believe that the observations are important but insufficient to sustain the first degree sex offense charges and that the expert's testimony prejudiced defendant. A young woman under the age of 13 who will accuse her brothers of rape is going to have severe credibility problems. I believe an expert who vouches for the victim's credibility was of great assistance in persuading the jury to believe that she had performed fellatio as she described it to the investigators. Therefore, I respectfully dissent.
 

 [1]
 

 We refer to the child victim and her younger brother by initials in order to protect their identities.
 

 [2]
 

 The State offered testimony from several other witnesses in addition to those discussed
 
 supra
 
 . The testimony of those witnesses was corroborative of the direct, eyewitness accounts of abuse offered by L.R. and her grandmother.