IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-963

 Filed: 3 September 2019

Forsyth County, No. 15 CRS 59032

STATE OF NORTH CAROLINA,

 v.

ERVAN L. BETTS, Defendant-Appellant.

 Appeal by defendant from judgment entered 23 March 2018 by Judge R. Stuart

Albright in Forsyth County Superior Court. Heard in the Court of Appeals 23 April

2019.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General
 Catherine F. Jordan, for the State.

 Craig M. Cooley for defendant-appellant.

 BERGER, Judge.

 Ervan L. Betts (“Defendant”) appeals from his convictions of three counts of

indecent liberties with a child. Defendant argues the trial court plainly erred by (1)

not issuing a limiting instruction regarding “profile” testimony; (2) allowing

testimony and reports that amounted to improper vouching for the credibility of the

victim; (3) incorrectly instructing the jury on the proper use of testimony related to

the victim’s PTSD; and (4) admitting evidence of prior incidents of domestic violence

by Defendant. Defendant also argues that he did not receive a fair trial due to the

cumulative effect of these purported errors. We disagree.

 Factual and Procedural Background
 STATE V. BETTS

 Opinion of the Court

 In 2013, Charity Luck (“Luck”) gave birth to a daughter, B.C., who had illegal

drugs in her system at birth. The Forsyth County Department of Social Services

(“DSS”) began investigating Luck and her children. On October 25, 2013, social

worker Melony Archie (“Archie”) conducted an interview with M.C., Luck’s seven year

old daughter. M.C. informed Archie that Defendant had touched her inappropriately.

When Archie asked M.C. additional questions, she denied being touched

inappropriately by Defendant, but described incidents of domestic violence between

Luck and Defendant.

 On November 4, 2013, Archie conducted a follow-up interview with M.C.

at her elementary school. During this interview, M.C. stated that Defendant “rubbed

and poked” her vagina while she had taken a nap in a bedroom. When M.C. rolled

over, Defendant left the bedroom to watch T.V. in the living room. Based upon M.C.’s

comments, Archie referred M.C. to Vantage Pointe Child Advocacy Center for a

forensic interview. Archie also contacted Sergeant Crystal Prichard with the

Winston-Salem Police Department.

 On November 26, 2013, Fulton McSwain (“McSwain”), conducted a

forensic interview with M.C. McSwain videotaped the interview and wrote a report

(“McSwain Report”) summarizing the forensic interview. M.C. told McSwain about

instances of domestic violence by Defendant and referenced two specific instances in

which Defendant touched her inappropriately. M.C. told McSwain that in March

 -2-
 STATE V. BETTS

 Opinion of the Court

2013, Defendant had said, “[expletive deleted] you [expletive deleted],” and “slapped

[her] on the leg really hard.” M.C. also reported that Defendant had punched her

mother on one occasion, and tried to break into their apartment while holding a gun

on another.

 M.C. also informed McSwain that one night when she had slept in the bed with

Luck and Defendant, Defendant “pulled up her nightgown then went inside of her

underwear and touched her vagina . . . . in a circular motion” when Luck had gone to

the bathroom. M.C. rolled over, fell off the bed, and struck her head on a small

refrigerator located next to the bed. When Luck returned from the bathroom, she

picked M.C. up, and carried her to the living room. M.C. said Defendant approached

her shortly thereafter and threatened to hurt her if she told anyone.

 M.C. told McSwain that Defendant had touched her inappropriately on several

occasions between January and March 2013, but Defendant had “never penetrated

her vagina.” M.C. was unable to state the exact number of times Defendant touched

her inappropriately, but told McSwain that Defendant “kept on doing it over and over

again.” McSwain asked M.C. if Defendant had ever touched her on another part of

her body. M.C. reported “one incident in which [Defendant] reached his hand inside

of her shirt and rubbed her breasts” on the living room couch while Luck was outside

smoking a cigarette.

 -3-
 STATE V. BETTS

 Opinion of the Court

 In the conclusion of McSwain’s report documenting his interview with M.C.,

McSwain wrote that M.C. had “disclosed that the alleged assailant, [Defendant],

sexually abused her on multiple occasions” and M.C. “reported to being truthful and

did not appear to display any overt signs of deception.”

 M.C. was also seen by Mary Katherine Masola (“Masola”), a licensed clinical

social worker with DSS. Masola also assessed M.C. for neglect, sexual abuse, and

violence, and determined that M.C. had post-traumatic stress disorder (“PTSD”).

Masola encouraged M.C. to prepare a “trauma narrative” as part of her treatment.

The trauma narrative consisted of chapters entitled: “Meet the Author!”; “What Erv

Did to My Mom; “When Erv Touched Me”; “When Erv Pulled [out] a Gun and Tried

to Break Into My House”; and “When I Told.”

 M.C. told Masola of three occasions which were depicted in the trauma

narrative. The first occurred when M.C. was sleeping in the middle of the bed in-

between Defendant and Luck. M.C. stated in the trauma narrative:

 I was in the middle, and [Defendant] rolled over to me and
 touched me in my private part with his hand. . . . [H]e put
 his hand in my pants. . . . He started moving his fingers
 around on top of my private parts. Then he took his hand
 out of my pants, and rolled over and went back to sleep. . . .
 [Luck] was facing the other way. . . . I went to the
 bathroom, but I didn’t really go to the bathroom. I went
 back to the living room. The next morning, [Defendant] left
 and my mom asked me where I went. And I told her that I
 thought I went to the bathroom, but I went to the living
 room.

 M.C. wrote about another occasion in the trauma narrative:

 -4-
 STATE V. BETTS

 Opinion of the Court

 About two weeks later, I was sitting [o]n the floor and
 [Defendant] was helping me with my homework at the
 coffee table, and he reached over and put his hand inside
 my shirt. . . . He pulled his hand out and I pretended I had
 to go to the bathroom and I went to the bathroom and I
 cried. . . . I came back out and I waited until [Defendant]
 was gone, and I told [Luck]. She said she was going to call
 Grandma Sue and talk to her about it, but we forgot about
 it again.

 M.C. described the third occasion in the trauma narrative as follows:

 One day, I was taking a nap on the couch and [Luck] was
 in the bathroom. [Defendant] came over and put his hand
 in my pants and touched me. I felt worried. He didn’t say
 anything. . . . My mom came out of the bathroom and
 [Defendant] rushed over to the recliner. I went back to
 sleep and when I woke up, [Defendant] was acting weird.
 He was talking fast and he was shaky and acting like he
 did something wrong. He left[.]

 The trauma narrative also included incidents of domestic violence between

Luck and Defendant. According to Masola, M.C. “reported several incidents of her

mom. . . getting a black eye, having a bloody nose, [and] having to call the ambulance”

on occasions when she had been hit by Defendant. M.C. also told Masola of a time

when Defendant had broken into Luck’s apartment with a firearm.

 On April 25, 2016, the Forsyth County Grand Jury indicted Defendant on three

counts of indecent liberties with a child occurring between January and March 2013.

At trial, witnesses for the State included M.C., Archie, McSwain, and Masola.

McSwain and Masola were qualified as expert witnesses. Defense counsel initially

objected to introduction of the McSwain Report into evidence; however, Defendant

 -5-
 STATE V. BETTS

 Opinion of the Court

did not object to entry of a redacted version. The trauma narrative was also admitted

into evidence without objection.

 Defendant did not testify at trial, and the jury found Defendant guilty of all

counts of taking indecent liberties with a child. For each count, the jury also found

the presence of two aggravating factors which included the victim being very young,

and Defendant taking advantage of a position of trust or confidence to commit the

offenses. The trial court sentenced Defendant to an active sentence of three

consecutive terms of 31 to 47 months imprisonment. Defendant appeals.

 Standard of Review

 In criminal cases, an issue that was not preserved
 by objection noted at trial and which is not deemed
 preserved by rule or law without any such action
 nevertheless may be made the basis of an issue presented
 on appeal when the judicial action questioned is
 specifically and distinctly contended to amount to plain
 error.

N.C.R. App. P. 10(a)(4). To establish plain error,

 a defendant must demonstrate that a fundamental error
 occurred at trial. To show that an error was fundamental,
 a defendant must establish prejudice—that, after
 examination of the entire record, the error had a probable
 impact on the jury’s finding that the defendant was guilty.
 Moreover, because plain error is to be applied cautiously
 and only in the exceptional case, the error will often be one
 that seriously affects the fairness, integrity, or public
 reputation of judicial proceedings.

State v. Lawrence, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations, quotation

marks, and brackets omitted).

 -6-
 STATE V. BETTS

 Opinion of the Court

 “The plain error standard of review applies on appeal to unpreserved

instructional or evidentiary error.” Id. The Supreme Court of North Carolina applied

plain error review to a trial court’s failure to strike, on its own motion, improper

testimony from an expert witness vouching for the credibility of an alleged sexually

abused child. State v. Towe, 366 N.C. 56, 61, 732 S.E.2d 564, 567 (2012).

 Analysis

 I. “Profile” Testimony

 Defendant first argues that the trial court plainly erred by not giving a limiting

instruction to the jury regarding McSwain and Masola’s “profile” testimony. We

disagree.

 Initially, we note that experts are permitted to testify about the profiles of

victims of sexual abuse. State v. Stancil, 355 N.C. 266, 267, 559 S.E.2d 788, 789

(2002); see also State v. Hall, 330 N.C. 808, 817, 412 S.E.2d 883, 887 (1992)

(permitting the use of expert testimony “that a particular child’s symptoms were

consistent with those of sexual or physical abuse victims, but only to aid the jury in

assessing the complainant’s credibility.”); State v. Ware, 188 N.C. App. 790, 656

S.E.2d 662 (2008). This type of profile evidence should be limited to its “permissible

uses,” and if admitted, the trial court should generally provide a limiting instruction.

See Hall, 330 N.C. at 822, 412 S.E.2d at 891.

 -7-
 STATE V. BETTS

 Opinion of the Court

 However, our courts have consistently held that “[t]he admission of evidence

which is competent for a restricted purpose without limiting instructions will not be

held to be error in the absence of a request by the defendant for such limiting

instructions.” State v. Allen, 141 N.C. App. 610, 616, 541 S.E.2d 490, 495 (2000)

(citation and quotation marks omitted); see also State v. Cox, 303 N.C. 75, 83, 277

S.E.2d 376, 381-82 (1981) (holding that, where a witness’s testimony was admissible

for corroborative purposes, there was no error when the defendant failed to request

an instruction limiting that testimony to those permissible purposes).

 Here, both McSwain and Masola provided versions of what is considered profile

testimony. Defendant contends that the following testimony from McSwain required

a limiting instruction:

 [Prosecutor]. And through the course of your employment,
 are you familiar with characteristics of children that have
 been sexually abused?

 [McSwain]. Yes, ma’am.

 [Prosecutor]. And what are those characteristics?

 [McSwain]. There’s a number of different characteristics.
 For example, a lot of times children who’ve been exposed to
 sexual maltreatment, they’re fearful of the offender. A lot
 of times, shame, they’re embarrassed or feel a sense of guilt
 about the abuse happening to them. In some instances,
 kids may display signs of depression or anxiety, so there’s
 a number of different characteristics that may come out.
 The thing about it is the characteristics are varied for each
 child. Not every child displays the exact same
 characteristics.

 -8-
 STATE V. BETTS

 Opinion of the Court

 [Prosecutor]. And are you trained to observe those
 characteristics when you’re conducting forensic
 interviews?

 [McSwain]. Yes, ma’am.

 [Prosecutor]. And what, if any, characteristics did you
 observe during your forensic interview of [M.C.]?

 [McSwain]. [M.C.] expressed being fearful of [Defendant],
 feeling in danger, not feeling safe around him.

In addition, Defendant takes issue with Masola’s testimony that she was familiar

with characteristics of children who had been sexually abused, including anxiousness

and nervousness, and that M.C. was hesitant to talk about sex, nervous, anxious, and

worried.

 As Defendant concedes, our case law is clear that experts may provide testimony

regarding symptoms and characteristics of children that have been sexually abused.

State v. Kennedy, 320 N.C. 20, 32, 357 S.E.2d 359, 366 (1987). However, Defendant

takes issue with the trial court’s failure to limit the testimony to its permissible use,

and argues that the jury may have treated the testimony as substantive evidence.

While it is true that the court did not offer a limiting instruction with respect to the

experts’ profile testimony, it is also true that Defendant never requested such an

instruction. As our case law indicates, there is no error in neglecting to give the

limiting instruction when the Defendant fails to request it. Because there was no

error by the trial court, there can be no “fundamental error [that] occurred at trial.”

 -9-
 STATE V. BETTS

 Opinion of the Court

Lawrence, 365 N.C. at 518, 723 S.E.2d at 334 (citations omitted). Thus, by definition,

there cannot be plain error.

 II. Vouching

 A. “Disclosure”

 Defendant next asserts that the trial court plainly erred by admitting

testimony from the State’s experts and lay witnesses into evidence during which the

witnesses repeatedly used the term “disclose,” or variations thereof, when

summarizing M.C.’s statements to them. Defendant contends use of the word

“disclose” amounted to vouching for M.C.’s credibility. We disagree.

 “[T]estimony of an expert to the effect that a prosecuting witness is believable,

credible, or telling the truth is inadmissible evidence.” State v. Bailey, 89 N.C. App.

212, 219, 365 S.E.2d 651, 655 (1988) (citations omitted). Our Supreme Court has held

“[t]he jury is the lie detector in the courtroom and is the only proper entity to perform

the ultimate function of every trial—determination of the truth.” State v. Kim, 318

N.C. 614, 621, 350 S.E.2d 347, 351 (1986). “In child sexual abuse cases, where there

is no physical evidence of the abuse, an expert witness’s affirmation of sexual abuse

amounts to an evaluation of the veracity of the child witness and is, therefore,

impermissible testimony.” State v. Crabtree, ___ N.C. App. ___, ___, 790 S.E.2d 709,

714 (2016), review on additional issues denied, appeal dismissed, 369 N.C. 195, 793

S.E.2d 687 (2016), and aff’d, 370 N.C. 156, 804 S.E.2d 183 (2017).

 - 10 -
 STATE V. BETTS

 Opinion of the Court

 Based upon this principle, this Court held “[i]t is fundamental to a fair trial

that the credibility of witnesses be determined by the jury.” State v. Hannon, 118

N.C. App. 448, 451, 455 S.E.2d 494, 496 (1995) (citation omitted). Therefore, expert

witnesses may not vouch for the credibility of victims in child sex abuse cases when

there is no evidence of physical abuse. Stancil, 355 N.C. at 266-267, 559 S.E.2d at

789. Our Supreme Court “has found reversible error when experts have testified that

the victim was believable, had no record of lying, and had never been untruthful.”

State v. Aguallo, 322 N.C. 818, 822, 370 S.E.2d 676, 678 (1988).

 Defendant relies on the unpublished opinion of State v. Jamison. In that case,

a panel of this Court determined that use of the term “disclose” “lent credibility to

[the victim’s] testimony” and “is itself a comment on the declarant’s credibility and

the consequent reliability of what is being revealed.” State v. Jamison ___ N.C. App.

___, 821 S.E.2d 665 (2018) (unpublished), review denied, ___ N.C. ___, 826 S.E.2d 701

(2019). In reaching this result, the Jamison panel relied almost exclusively on State

v. Frady.

 Frady, as here and in Jamison, involved a child sexual assault case with no

physical evidence. There, the expert testified as follows:

 Q. Did you form an opinion as to whether [Debbie’s]
 disclosure was consistent with sexual abuse?

 ....

 [Expert Witness]. Yes.

 - 11 -
 STATE V. BETTS

 Opinion of the Court

 Q. And what was your opinion?

 [Expert Witness]. Our report reads that her disclosure is
 consistent with sexual abuse.

 Q. And what did you base your opinion on?

 [Expert Witness]. The consistency of her statements over
 time, the fact that she could give sensory details of the
 event which include describing being made wet and the
 tickling sensation.... [a]nd her knowledge of the sexual act
 that is beyond her developmental level.

State v. Frady, 228 N.C. App. 682, 684, 747 S.E.2d 164, 166, review denied, 367 N.C.

273, 752 S.E.2d 465 (2013). This Court granted a new trial because the expert stated

“that [the victim]’s ‘disclosure’ was ‘consistent with sexual abuse.’ The alleged

‘disclosure’ was [the victim]’s description of the abuse. . . . [Thus, the expert]

essentially expressed her opinion that [the victim] is credible. We see no appreciable

difference between this statement and a statement that [the victim] is believable.”

Id. at 685-86, 747 S.E.2d at 167.

 Defendant contends Jamison is persuasive.1 However, the Jamison panel’s

reliance on Frady was misplaced as the reasoning in Frady was not based on defining

“disclose” or prohibiting use of the word “disclose.” As illustrated by this Court’s

 1 The Defendant highlights questions by the prosecutor and testimony which Defendant
contends demonstrates the improper use of variations of the term “disclose” at trial. However, in each
of these instances, “disclose” is synonymous with: admit, divulge, reveal, tell, communicate, bring to
light, and make known. See DISCLOSE, www.thesaurus.com/browse/disclose. Each of these
examples, and the uses throughout the trial, involve M.C. communicating to another individual what
took place.

 - 12 -
 STATE V. BETTS

 Opinion of the Court

discussion in Frady, the term “disclosure” merely means the content of the victim’s

description of abuse. Id. at 685, 747 S.E.2d at 167 (“The alleged ‘disclosure’ was [the

victim’s] description of the abuse.”). It does not go to believability or credibility of the

information provided, or the witness’ opinion as to whether or not that information

was believable. Contrary to the analysis in Jamison, Frady does not stand for the

proposition that use of the word “disclosure” was error. Rather, the expert’s

testimony in Frady that the victim’s description of the abuse “was consistent with

sexual abuse” was the equivalent of testifying the victim was credible.

 There is nothing about use of the term “disclose”, standing alone, that conveys

believability or credibility. Jamison should not be viewed as persuasive on this point

and this Court is unaware of any opinion prior to Jamison that held that use of the

word “disclose” amounted to error because that term was tantamount to testimony

that a victim was “believable, had no record of lying, and had never been untruthful.”

Aguallo, 322 N.C. at 822, 370 S.E.2d at 678. Because Jamison is not controlling, not

persuasive, and as discussed above, did not properly analyze Frady, we decline to

follow that panel’s reasoning.

 Even if we assume there was error when the trial court did not intervene

when the term “disclose” was used, Defendant has not demonstrated plain error. The

victim testified about two incidents of sexual assault in which Defendant placed his

hand under her clothing and rubbed her vagina, and one incident in which Defendant

 - 13 -
 STATE V. BETTS

 Opinion of the Court

placed his hand in her shirt and rubbed her chest. The victim provided details and

descriptions of these incidents and surrounding circumstances which the jury could

consider and weigh in light of the other evidence presented. In addition, the jury also

observed the forensic interview of the victim by McSwain which was preserved on

video, and considered the McSwain Report which is discussed further herein.

 That there may have been inconsistencies in the victim’s accounts is not the

issue. The jury had the opportunity to observe the victim’s testimony and make its

own independent determination about her believability and credibility, and it is not

for this Court to reweigh the evidence. There was substantial evidence from which

the jury could find Defendant touched M.C. inappropriately. The jury had the

opportunity to make its own independent assessment concerning the victim’s

credibility consistent with the trial court’s instructions, and Defendant has not

demonstrated that use of the word “disclose” had a probable impact on the jury’s

finding.

 B. The McSwain Report

 Defendant next argues plain error in the trial court’s admission of the McSwain

Report. We disagree.

 Defendant argues the “trial court plainly erred because the opinions and

recommendations in the [McSwain Report] clearly establish McSwain found M.C. and

her sexual abuse allegations credible and believed in [Defendant’s] guilt.”

 - 14 -
 STATE V. BETTS

 Opinion of the Court

 As noted, McSwain was tendered and admitted as an expert in conducting

forensic interviews of children. McSwain defined a “forensic interview” as “a

structured conversation with the child designed to elicit details about a specific event

or events that the child has . . . experienced.” McSwain’s report summarized the

information M.C. had told him during the forensic interview, and contained his

conclusions and recommendations. After Defendant’s initial objections, a redacted

version was also admitted into evidence.

 Defendant highlights numerous portions of the McSwain Report that he

contends improperly vouch for M.C.’s credibility, including the following sentences

within a section entitled “Impressions”:

 [M.C.] displayed age appropriate competencies across all
 spheres of functioning. . . . [M.C.] appeared resistant to
 suggestion, unaffected by the primacy-recency effect, with
 appropriate memory recall and a willingness to correct the
 clinician as needed. . . . [M.C.] engaged appropriately in
 dialogue, stayed focused and followed commands. . . .
 [M.C.’s] language skills . . . appeared appropriate for
 information gathering purposes. . . . [M.C.] demonstrated
 that she understood the difference between telling the truth
 and telling a lie. [M.C.] reported an acceptance of the
 obligation to report information truthfully.

(Alterations in original).

 Defendant also asserts the following paragraph from a section entitled

“Summary/Conclusion” as improper vouching:

 The interview notes that during the forensic interview
 session, [M.C.] appeared to be consistent with the

 - 15 -
 STATE V. BETTS

 Opinion of the Court

 information . . . about [Defendant] sexually abusing her. In
 addition, she reported to being truthful and did not appear
 to display any overt signs of deception. [M.C.]’s assessment
 was consistent with that of someone who has been sexually
 abused.

 Defendant contends the use of “assailant” in the following sentence from a

section entitled “Recommendations” constitutes an improper comment upon

Defendant’s guilt:

 2. The interviewer would strongly encourage that [M.C.]
 remain inaccessible to the alleged assailant until the
 reasonable conclusion to this investigation and
 determination is made that [M.C.] is emotionally and
 physically safe when in the assailant’s presence[.]

(Alteration in original).

 However, upon review of the trial transcript, we must conclude Defendant is

unable to show plain error with respect to any portion of the McSwain Report. At

trial, defense counsel initially objected to the State’s motion to introduce the McSwain

Report. Following a colloquy with the trial court, defense counsel stated she would

not object to the McSwain Report, if the State were to make certain redactions. The

trial court permitted the State, with Defendant’s consent, to review the McSwain

Report during an evening recess and address statements within the report Defendant

had found objectionable. The trial court took Defendant’s objection under advisement

and deferred ruling upon the objection until the State had reviewed and redacted

portions of the McSwain Report, and Defendant had the opportunity to review the

redacted version.

 - 16 -
 STATE V. BETTS

 Opinion of the Court

 The next day, the State informed the trial court that it had made the redactions

to the report. After reviewing the redacted version of the McSwain Report, defense

counsel told the trial court, “The objectionable materials have been removed.” The

State renewed its motion to admit the McSwain Report and the following exchange

occurred:

 [Prosecutor]: Your honor, at this time, the state would
 move to introduce [the McSwain Report], which is the
 report from Fulton McSwain, the forensic interviewer.

 THE COURT: Any objection?

 [Defense Counsel]: No, your honor.

 THE COURT: Without objection, [the McSwain Report] is
 hereby admitted.

 Under Section 15A-1443 of the North Carolina General Statutes, “[a]

defendant is not prejudiced by the granting of relief which he has sought or by error

resulting from his own conduct.” N.C. Gen. Stat. § 15A-1443(c) (2017). “Thus, a

defendant who invites error has waived his right to all appellate review concerning

the invited error, including plain error review.” State v. Bice, ___ N.C. App. ___, ___,

821 S.E.2d 259, 264-65 (2018) (quoting State v. Barber, 147 N.C. App. 69, 74, 554

S.E.2d 413, 416 (2001)), disc. review denied, ___ N.C. ___, ___ S.E.2d ___ (Aug. 14,

2019).

 Defendant’s counsel not only failed to renew Defendant’s objection to the

admission of the McSwain Report, but she affirmatively and explicitly represented

 - 17 -
 STATE V. BETTS

 Opinion of the Court

that she had no objection to the admission of the McSwain Report after the State had

made the requested redactions. To the extent there was error by the trial court in

admitting the McSwain Report, including the statements Defendant takes issue with

on appeal, it was invited error. Id. Defendant’s arguments on appeal concerning the

McSwain Report are waived.

 III. PTSD Testimony

 Defendant also argues that the trial court plainly erred by giving the jury an

impermissible limiting instruction with respect to Masola’s testimony regarding

M.C.’s PTSD diagnosis. We disagree.

 Our Supreme Court addressed the question of admissibility of PTSD testimony

in State v. Hall. While the Court declined to offer an “exhaustive” list of acceptable

uses of such testimony, it did explicitly address a few: “For example, testimony on

post-traumatic stress syndrome may assist in corroborating the victim’s story, or it

may help to explain delays in reporting the crime or to refute the defense of consent.”

Hall, 330 N.C. at 822, 412 S.E.2d at 891. The Court also noted that “[i]f admitted,

the trial judge should take pains to explain to the jurors the limited uses for which

the evidence is admitted. In no case may the evidence be admitted substantively for

the sole purpose of proving that a rape or sexual abuse has in fact occurred.” Id.

 Here, the trial court gave the following instruction to the jury after the

admission of the PTSD testimony:

 - 18 -
 STATE V. BETTS

 Opinion of the Court

 THE COURT: Let me interrupt for just a minute. Members
 of the jury, with regard to the testimony regarding the
 alleged victim having some type of post-traumatic stress
 disorder, that testimony is being admitted for two purposes
 for your consideration.

 One, is to corroborate the alleged victim’s testimony, to the
 extent that you find it does so corroborate her testimony.
 The other purpose is to explain a delay of reporting crimes
 in this case. Except as it bears on one of those two
 decisions, you’re not to consider that particular evidence
 for any other purpose. Sorry for the interruption. Go right
 ahead.

 At the conclusion of the trial, the judge gave a virtually identical instruction to

the jury. Defendant takes issue with the second part of this instruction, specifically

the language about “explain[ing] a delay.” He argues that the jury cannot consider

the evidence for this purpose without also concluding that the sexual assault actually

occurred. However, the Hall court specifically designated “explain[ing] delays” as a

permissible purpose for PTSD evidence. Id.

 The trial court’s limiting instruction to permissible uses of the PTSD evidence

clearly indicated that the evidence was not to be used for substantive purposes.

Because the trial court did not err, Defendant cannot establish plain error.

 IV. Evidence of Domestic Violence

 Defendant next argues that the trial court plainly erred by admitting evidence

of Defendant’s past incidents of domestic violence against Luck and M.C in violation

of North Carolina Rules of Evidence 401 and 403. We disagree.

 - 19 -
 STATE V. BETTS

 Opinion of the Court

 Rule 401 states that “ ‘Relevant evidence’ means evidence having any tendency

to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence.” N.C.

Gen. Stat. § 8C-1, Rule 401 (2017). Rule 403 states that “[a]lthough relevant,

evidence may be excluded if its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative

evidence.” N.C. Gen. Stat. § 8C-1, Rule 403 (2017).

 “[T]he balance under Rule 403 favors admissibility of probative evidence.”

State v. Peterson, 179 N.C. App. 437, 460, 634 S.E.2d 594, 612 (2006). This Court has

held that incidents of domestic violence are “probative of the victim’s motivation not

to immediately report crimes” in sexual assault cases. State v. Espinoza-Valenzuela,

203 N.C. App. 485, 491 692 S.E.2d 145, 151 (2010).

 Here, Defendant argues that the domestic violence evidence “was of no

consequence to the determination of whether [he] took indecent liberties with M.C.”

Yet Espinoza recognizes that this evidence can be permissible in cases like, as here,

where the victim has delayed in reporting the alleged sexual abuse. The evidence of

domestic violence was not substantially more prejudicial than probative, and went

directly to the victim’s fear or apprehension in reporting the sexual abuse. Thus, the

 - 20 -
 STATE V. BETTS

 Opinion of the Court

trial court did not err in admitting the evidence of Defendant’s domestic violence

incidents.

 Conclusion

 Defendant received a fair trial, free from prejudicial error. 2

 NO PLAIN ERROR.

 Chief Judge MCGEE concurs.

 Judge TYSON dissents with separate opinion.

 2 Because we find no prejudicial error, we need not address Defendant’s argument that the
cumulative effect of the purported errors rendered his trial fundamentally unfair.

 - 21 -
 No. COA18-963 – State v. Betts

 TYSON, Judge, concurring in part and dissenting in part.

 The State’s entire case against Defendant rests wholly upon the

uncorroborated and inconsistent reconstructed memories of a witness, who was six

years old when these events purportedly occurred. The evidence also shows the

witness expressed motivations to lie. The credibility of the complainant was the sole

evidence and issue before the jury. The State failed to call or present any one of a

number of other persons named as either present or aware, who could have

corroborated complainant’s allegations, if true.

 The State produced no other physical evidence, eyewitness testimony or

anything else to corroborate these allegations, other than improper bolstering babble

restating M.C.’s allegations. The trial court plainly erred in admitting evidence that

improperly vouched for the credibility of the complainant, the sole province of the

jury. This inadmissible testimony prejudiced Defendant to grant a new trial. I

respectfully dissent.

 I. Background

 The majority’s opinion details some factual background, but omits many

critical facts, which directly impact the deliberation and outcome of this case. Charity

Luck lived with her six-year old daughter, M.C., and a younger daughter, H.C., in a

two-bedroom apartment. M.C is the sole complaining witness. Luck and her two
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

daughters shared the two-bedroom apartment with a male roommate, Michael,

between January to March 2013, the perimeter of times of M.C’s allegations.

 During this time, Luck was engaged in a relationship with Defendant.

Defendant has no prior record of any sexual offenses. In the fall of 2013, Luck gave

birth to another daughter, B.C. Defendant was excluded as the father of B.C. Post-

natal testing conducted on B.C. revealed the presence of illegal drugs in her body at

birth.

 The Forsyth County DSS was informed and began an investigation of Luck,

and her children. DSS social worker, Melony Archie was assigned to investigate the

case. During Archie’s initial interview on 25 October 2013, M.C. purportedly asserted

Defendant had touched her inappropriately. When Archie asked M.C. additional

questions, she denied being touched inappropriately by Defendant.

 Archie conducted a second interview on 4 November 2013 with M.C. at her

elementary school. During this interview, M.C. alleged one incident of inappropriate

touching, which purportedly occurred as she was taking a nap in the bedroom. In

this incident, M.C. alleged Defendant touched her near her vagina. Based upon her

comment recounting the allegedly inappropriate touching, Archie referred M.C. to

VPC for a forensic interview. Archie also reported M.C.’s allegation to Police

Sergeant Prichard on 2 December 2013.

 2
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 VPC’s program manager, Fulton McSwain, conducted a “forensic interview” of

M.C., from which he prepared in the McSwain Report. In asserting an instance of

domestic violence, M.C. told McSwain: “My mom talks to this guy [Defendant] and

one day I was joking around with him and he got really mad and he slapped me on

the leg really hard.” M.C. also asserted Defendant had stated, “F[**]k you b[*]tch,”

when he slapped her. M.C stated this incident occurred sometime in March 2013.

As noted by the majority opinion, M.C. also asserted Defendant had punched her

mother, and had alleged another incident asserting Defendant had tried to break into

their apartment while holding a gun. None of these allegations were either reported,

independently documented, verified, or corroborated.

 M.C. initially said the first incident of inappropriate touching had occurring in

the summer of 2012, but later stated all incidents had occurred between January and

March 2013. M.C. also told McSwain Defendant had “never penetrated her vagina.”

 Regarding alleged sexual contact, M.C. “disclosed” a purported incident on an

unspecified date when she had slept in the bed with Luck and Defendant. During the

night, Luck left the bed and while in the bathroom, M.C. alleged Defendant

purportedly “rolled over” and “pulled up her nightgown then went inside of her

underwear and touched her vagina . . . . in a circular motion.”

 M.C. rolled over, fell off the bed, and struck her head on a small refrigerator

located next to the bed. Luck returned from the bathroom, picked her up off the floor,

 3
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

carried her to the living room, and placed her on the couch. M.C. alleged Defendant

exited the bedroom shortly thereafter, approached her, and whispered, “If you tell

anybody that I did this, I’m going to hurt you.”

 McSwain reported M.C. also asserted Defendant had “touched her private

more than [one] time but was unable to state the exact number of times it happened.”

McSwain asked M.C. if Defendant had ever touched her on another part of her body.

M.C. did not report the alleged “leg slapping” allegation, but recounted “one incident

in which [Defendant] reached his hand inside of her shirt and rubbed her breasts” on

the living room couch while Luck was outside the home smoking a cigarette.

 In his report documenting his interview with M.C., McSwain concluded M.C.

had “disclosed that the alleged assailant, [Defendant], sexually abused her on

multiple occasions” and opined of M.C’s credibility that she “reported to being

truthful and did not appear to display any overt signs of deception.”

 In addition to reporting M.C.’s allegations to Sergeant Prichard on 2 December

2013, Archie also referred M.C. to Mary Katherine Mazzola, a DSS licensed clinical

social worker. Mazzola diagnosed M.C. with post-traumatic stress disorder.

 Mazzola encouraged M.C. to prepare a written “trauma narrative” to help M.C.

“process [her] trauma.” Mazzola reported three occasions when Defendant had

purportedly touched M.C. inappropriately inside Luck’s apartment, including one

 4
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

time in the bedroom, and twice in the living room. The first occasion allegedly

occurred when M.C. was sleeping between Defendant and Luck.

 I was in the middle and [Defendant] rolled over to me and
 touched me in my private part with his hand. [H]e put his
 hand in my pants. . . . He started moving his fingers around
 on top of my private parts. Then he took his hand out of
 my pants and rolled over and went back to sleep. . . . My
 mom [Luck] was facing the other way. . . . I went to the
 bathroom but I didn’t really go to the bathroom, I went
 back to the living room. The next morning [Defendant] left
 and my mom asked me where I went and I told her that I
 thought I went to the bathroom but I went to the living
 room.

 M.C. alleged the second event in her trauma narrative occurred as follows:

 About two weeks later I was sitting [o]n the floor and
 [Defendant] was helping me with my homework at the
 coffee table and he reached over and put his hand inside
 my shirt. . . . He pulled his hand out and I pretended I had
 to go to the bathroom and I went to the bathroom and I
 cried. . . . I came back out and I waited until [Defendant]
 was gone and I told [Luck]. She said she was going to call
 Grandma Sue and talk to her about it. But we forgot about
 it again.

 M.C. alleged the third occasion in the trauma narrative occurred as follows:

 One day I was taking a nap on the couch and [Luck] was in
 the bathroom. [Defendant] came over and put his hand in
 my pants and touched me. I felt worried. He didn’t say
 anything. . . . My mom came out of the bathroom and
 [Defendant] rushed over to the recliner. I went back to
 sleep and when I woke up [Defendant] was acting weird.
 He was talking fast and he was shaky and acting like he
 did something wrong. He left[.]

 5
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 The narrative also asserted domestic violence between Luck and Defendant

that M.C. reported to Mazzola. According to Mazzola, M.C. “reported several

incidents of her mom . . . getting a black eye, having a bloody nose, [and] having to

call the ambulance” on occasions when Luck had been hit by Defendant. M.C. also

told Mazzola of a time when Defendant had purportedly attempted to break into

Luck’s apartment with a firearm. No evidence was introduced by the State to

corroborate any of these allegations or incidences.

 Defendant was arrested and charged with taking indecent liberties with a child

on 10 November 2015, two years after M.C. had first met with Archie at DSS and

stated, then denied, Defendant had inappropriately touched her. The 25 April 2016

indictment alleged Defendant had committed three “lewd and lascivious acts” upon

M.C. on three occasions between January and March, 2013, more than three years

prior to the indictment

 The State did not present any physical evidence or call Luck, Grandma Sue,

Aunt Tory or Luck’s roommate, Michael, as witnesses to corroborate any of M.C.’s

allegations at trial. McSwain and Mazzola were qualified and admitted as expert

witnesses. After defense counsel’s objections and later agreement, the trial court

admitted a redacted version of the McSwain Report into evidence. The trauma

narrative was also admitted into evidence without objection.

 II. Issues

 6
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 Defendant argues the trial court committed plain error by: (1) permitting the

State’s witnesses and the prosecutor to repeatedly use the terms “disclosure,”

“disclose,” and “disclosed” to describe how M.C. had recounted the alleged incidences;

(2) admitting portions of the McSwain Report; (3) not issuing a limiting instruction

to the jury regarding certain profile testimony of McSwain and Mazzola; (4)

permitting Mazzola to improperly vouch for M.C.’s credibility by testifying that M.C.

had, in fact, experienced a number of traumas; (5) instructing the jury it could

consider Mazzola’s testimony regarding how M.C. having PTSD may have caused her

to delay reporting Defendant’s alleged acts of inappropriate touching; (6) permitting

the State to introduce evidence and testimony regarding alleged incidents of domestic

violence between M.C.’s mother and Defendant. and, (7) the cumulative effects of

errors are prejudicial to award a new trial.

 Defendant’s appellate counsel concedes his trial counsel did not object to the

admission of evidence and instruction he now challenges. Defendant acknowledges

these issues are reviewed on appeal for plain error, except the prejudice from

cumulative effects of the errors.

 III. Standard of Review

 The majority opinion sets forth the proper standard of plain error review under

Rule of Appellate Procedure 10(a)(4) and our case law.

 7
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 Plain error review is applied in the absence of an objection “to a trial court’s

failure to strike, on its own motion, improper testimony from an expert witness

vouching for the credibility of an alleged sexually abused child. State v. Towe, 366

N.C. 56, 61, 732 S.E.2d 564, 567 (2012).

 IV. Disclosure

 Defendant argues the trial court committed plain error by admitting testimony

from the State’s experts and lay witnesses during which the witnesses repeatedly

used the terms “disclose” or “disclosed,” or variants thereof, when summarizing M.C.’s

allegations to them. Defendant contends these witnesses’ uses of “disclose” or

“disclosed” bolstered and constituted improper vouching for M.C.’s credibility.

 A. Rule Against Improper Vouching

 The Supreme Court of North Carolina has held “[t]he jury is the lie detector in

the courtroom and is the only proper entity to perform the ultimate function of every

trial—determination of the truth.” State v. Kim, 318 N.C. 614, 621, 350 S.E.2d 347,

351 (1986) (emphasis supplied). Following our Supreme Court’s long-standing rule

this Court has held “[i]t is fundamental to a fair trial that the credibility of the

witnesses be determined by the jury.” State v. Hannon, 118 N.C. App. 448, 451, 455

S.E.2d 494, 496 (1995) (citation omitted).

 Prior precedents have repeatedly admonished: “a witness may not vouch for

the credibility of a victim.” State v. Giddens, 199 N.C. App. 115, 121, 681 S.E.2d 504,

 8
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

508 (2009), aff'd per curiam, 363 N.C. 826, 689 S.E.2d 858-59 (2010). This prohibition

against vouching for the credibility of another witness applies during the testimony

of either an expert or a lay witness. State v. Coble, 63 N.C. App. 537, 541, 306 S.E.2d

120, 121 (1983). See also State v. Dixon, 150 N.C. App. 46, 52, 563 S.E.2d 594, 598

(2002) (“Expert opinion testimony is not admissible to establish the credibility of the

victim as a witness” (citation omitted)), aff’d per curium, 356 N.C. 428, 571 S.E.2d

584 (2002).

 The Supreme Court of North Carolina “has found reversible error when experts

have testified that the victim was believable, had no record of lying, and had never

been untruthful.” State v. Aguallo, 322 N.C. 818, 822, 370 S.E.2d 676, 678 (1988)

(citations omitted). “This Court has held that it is fundamental to a fair trial that a

witness’s credibility be determined by a jury, that expert opinion on the credibility of

a witness is inadmissible, and that the admission of such testimony is prejudicial

when the State’s case depends largely on the testimony of the prosecuting witness.”

Dixon, 150 N.C. App. at 53, 563 S.E.2d at 599 (citation omitted).

 B. Vouching Testimony by Use of “Disclose”

 The record and transcript show numerous instances in the testimony of the

State’s witnesses, and questions by the prosecutor of repeated uses of the terms

“disclose,” “disclosed,” “disclosure” and variants thereof, to refer to what M.C. had

asserted as sexual abuse by Defendant.

 9
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 McSwain testified chiefly about the VPC forensic interview he had conducted

with M.C. All through this testimony, he and the prosecutor repeatedly used the

terms “disclosed,” “disclose,” and “disclosure.” McSwain testified in relevant part, as

follows:

 [McSwain]: I asked [M.C.] about how her disclosure came
 about, how the allegations of abuse came out in the open or
 if she ever told anybody, and she did make a comment that
 she eventually did tell her mom about the alleged abuse.

 ....

 [McSwain]: I asked [M.C.], well, what did her mom say or
 how did her mom respond after her disclosure, and she
 stated that her mom said, “Well, I guess he did. Life has
 moved on.”

 ....

 [Prosecutor]: And after she gave you this particular
 disclosure, did she move on to another topic or did y’all
 continue to talk about disclosure?

 [McSwain]: Well, I questioned her about her concern. . .
 why she was concerned about her grandmother seeing the
 [forensic interview], the particular DVD [recording].

 ....

 [Prosecutor]: And was there any other disclosure that she
 made about being touched anywhere else on her body?

 [McSwain]: [M.C.] stated that she had not been touched
 any where else on her body outside of her private area and
 her breasts.

 ....

 10
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 [Prosecutor]: And what, if anything, did [M.C.] say about
 why she didn’t disclose?

 [McSwain]: She stated she didn’t tell anybody because
 [Defendant] had threatened to hurt her.

 ....

 [Defense counsel]: And, at that point in time, you started
 asking her questions about the alleged touching; is that
 right?

 [McSwain]: After she disclosed that when [Defendant]
 spends the night, sometimes he touches her private area.
 [Emphasis supplied].

 The State’s other expert witness, DSS social worker Mazzola, testified, in

response to the prosecutor’s questions, in relevant part:

 [Prosecutor]: And when you made the statement that you
 thought a lot of the trauma had to do with the domestic
 violence and the gun incident, and things of that nature,
 did that, in any way, discount her disclosure of sexual
 abuse? [Emphasis supplied]

 [Mazzola]: No.

 In addition to the State’s expert witnesses, the State elicited the testimony of

lay witnesses, Archie and Sergeant Prichard, who used the terms “disclose,”

“disclosure,” and “disclosed” numerous times during their testimonies:

 [Archie]: At a later interview, [M.C.] disclosed . . . . Oh. On
 this incident right here, she did not – at that time, she did
 not disclose anything during the first interview about – not
 saying anything to me or telling anyone (sic).

 11
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 ...

 [Archie]: . . . [M.C.] also disclosed that he had – when I
 asked her about touching her vagina, I asked her, you
 know, what did he do, and she stated that he rubbed and
 poked at it.

 ...

 [Prosecutor]: And after this initial interview, what, if any,
 reports did you make based on [M.C.’s] disclosure?
 [Emphasis supplied]

 [Archie]: A report was made to law enforcement.

 The prosecutor and Sergeant Prichard also repeatedly used the terms

“disclosed” and “disclosure” to describe what M.C. had alleged:

 [Prichard]: In the course of [Archie’s] investigation,
 additional information was disclosed by [M.C.] that she
 had been touched inappropriately by [Defendant], which
 was identified as Ms. Luck’s boyfriend.
 ...
 [Prichard]: Other than the biological information for the
 family, [Archie] had also indicated that a forensic interview
 had already been conducted prior to contacting me in which
 [M.C.] disclosed.
 ...
 [Prosecutor]: What, if anything, else did you ask Ms. Archie
 with regard to the disclosure of sexual abuse?

 [Prichard]: What the details of the disclosure were?

 [Prosecutor]: And what details were you given at that time?

 [Prichard]: That [M.C.] had been touched by [Defendant]
 on her private area.
 ...

 12
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 [Defense Counsel]: But you were aware that Ms. Archie
 had interviewed [M.C.] a couple of times prior to that?

 [Prichard]. I wasn’t aware of how many times. Like I said,
 at that point, I was not given her dictation. She just advised
 that [M.C.] had disclosed in the neglect investigation some
 form of inappropriate touch, so she made the referral to
 Vantage Point. [Emphasis supplied].

 Defendant argues this Court’s opinion in State v. Jamison prohibits witnesses’

frequent use of the term “disclose,” and variations thereof, to describe M.C.’s

allegations. State v. Jamison, __ N.C. __, 821 S.E.2d 665, 2018 WL 6318321 (2018)

(unpublished) , review denied, __ N.C. __, 826 S.E.2d 701 (2019). Defendant complied

with North Carolina Rule of Appellate Procedure 30(e)(3) and attached a copy of

Jamison to his brief, and served a copy on the State. N.C. R. App. P. 30(e)(3).

 In Jamison, the defendant was convicted of first-degree sex offense with a

child, indecent liberties with a child, and felony child abuse by a sexual act. 2018 WL

6318321 at *1. On appeal, the defendant argued the trial court plainly erred by

allowing an expert witness to bolster and vouch for the credibility of the child victim.

Id. at *4.

 As with McSwain here, the expert witness in Jamison was admitted as a

specialist in child forensic interviews. Id. This Court highlighted the relevant

portions of the expert’s testimony, in part, as follows:

 [The expert witness] explained that when she conducts a
 forensic interview with a child, she assesses for “any kind
 of barriers there might be for their disclosure.” [The child

 13
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 victim] provided [the expert witness] with “five separate
 episodic detailed events of times that she had been
 inappropriately touched.” At one point during [the expert
 witness’s] testimony, the prosecutor repeatedly used the
 word “disclose” in her questions. When asked, “Did [the
 child victim] disclose another incident to you?”, [the expert
 witness] responded by parroting the prosecutor’s wording,
 answering that [the child victim] “disclosed an incident.”
 Later, [the expert witness] described “barriers to
 disclosure” as “things that are [going to] influence the
 child’s ability and the extent to which they’re able to
 disclose their experiences.” [The expert witness] noted
 several barriers in [the child victim’s] case, including “her
 emotional closeness to the defendant,” the fact “that she
 had been threatened not to disclose” which “was very
 impactful for her in her interview and in other disclosures,”
 and “a lack of support from her mother.”

Id. (Emphasis supplied).

 This Court concluded and held the admission of the expert’s testimony was

plain error, in part, under the following reasoning:

 First, we note the frequent use of the terms “disclosure”
 and “disclose.” A disclosure is “[t]he act or process of
 making known something that was previously unknown; a
 revelation of facts[.]” Disclosure, Black’s Law Dictionary
 (9th ed. 2009). The use of this word suggests that there was
 something factual to divulge, and is itself a comment on the
 declarant’s credibility and the consequent reliability of
 what is being revealed. [The expert witness’s] repeated use
 of this term lent credibility to [the child’s] testimony.

Id. (Emphasis supplied).

 This Court ultimately held other substantial and properly admitted evidence

of guilt overcame this prejudice and sustained the conviction. Id. The other evidence

 14
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

of guilt in Jamison included, in part, the defendant never denying the child victim’s

accusation to police, and a video interview of the defendant with police in which the

defendant told an officer he “should believe any kid that makes these allegations, and

that [the child victim]—that it could be that [the child victim] was just crying out for

help.” Id. at *5.

 This Court’s analysis in Jamison confirmed the definitions and use of

“disclose,” “disclosure” or variants thereof by expert and lay witnesses to specifically

refer to a child’s statements alleging sexual abuse constitutes inadmissible bolstering

and vouching. Comparing the very similar manner of the expert witness’ use in

Jamison of “disclosure” and as was used by the prosecutor and numerous witnesses

here, this testimony clearly bolstered and improperly vouched for M.C.’s credibility.

Unlike Jamison, here, there is absolutely no physical evidence or other substantial

and properly admitted corroborating evidence of guilt to overcome this prejudice and

sustain Defendant’s conviction. See id.

 Black’s Law Dictionary’s definition of disclosure quoted in Jamison is

consistent with the meanings contained in other standard dictionaries of the English

language. See., e.g., American Heritage Dictionary 395 (3d ed. 1993) (“1. The act or

process of revealing or uncovering; 2. Something uncovered; a revelation.”); Webster’s

New World College Dictionary 419 (5th ed. 2014) (“1. A disclosing or being disclosed;

2: a thing disclosed; revelation.”).

 15
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 “Jurors are . . . presumed to understand the meaning of English words as they

are ordinarily used.” State v. Withers, 2 N.C. App. 201, 203, 162 S.E.2d 638, 640

(1968). The pervasive and repeated use of “disclosure” by the prosecutor and expert

witnesses, Mazzola and McSwain, and the lay witnesses, Archie and Sergeant

Prichard, “suggest[ed] that there was something factual to divulge, and [was] a

comment on [M.C.’s] credibility and the consequent reliability of what [she had]

revealed.” Jamison, 2018 WL 6318321 at *4.

 The majority’s opinion quotes a thesaurus to support their reasoning, which

only provides similar words and not a definition, instead of defining “disclose” or

“disclosure” by using a dictionary. The witnesses’ repeated use of “disclosure” and

variants thereof to describe M.C.’s allegations of indecent liberties by Defendant

conveys the message to bolster and vouch that M.C.’s statements were “revelations”

and were to be accepted and treated as factually true. Id.

 The State’s and its witnesses’ pervasive he use of “disclosure” and its variants,

especially by the expert witnesses, amounted to testimony “to the effect that [M.C.

was] believable, credible, or telling the truth[,]” which this Court has consistently

held to be inadmissible. State v. Dick, 126 N.C. App. 312, 315, 485 S.E.2d 88, 89 (1987)

(citation omitted); see State v. Oliver, 85 N.C. App. 1, 11, 354 S.E.2d 527, 533 (1987)

(“our courts have held expert testimony inadmissible if the expert testifies that the

prosecuting child-witness in a trial for sexual abuse is believable, or to the effect that

 16
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

the prosecuting child-witness is not lying about the alleged sexual assault.” (citations

omitted)).

 McSwain and Mazzola repeatedly used the terms “disclose” and “disclosure” at

other times in their testimony to refer to revelations of fact of sexual abuse by children

in a general sense, and not specifically to M.C.’s statements of sexual abuse. For

instance, McSwain also testified in relevant part:

 [Prosecutor]: Are you familiar with the ways in which
 children disclose sexual abuse?

 [McSwain]: Yes, ma’am.

 [Prosecutor]: And is disclosure an event or is it a process?

 [McSwain]: Disclosure of abuse is a process.

 ....

 [Prosecutor]: What types of factors, based on your training
 and experience, can affect how or when a child discloses?

 [McSwain]: There are a number of different factors that
 affect when a child discloses . . . [.]

 ....

 [McSwain]: I am aware of patterns of disclosure and things
 such as delayed disclosure.
 [Emphasis supplied].

 Following this Court’s holding in Jamison and reviewing the definitions and

plain meanings of “disclose” and “disclosure,” and their variants, the admission of the

witnesses’ testimony, in which “disclosure” and its variants was pervasively and

 17
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

repeatedly used by the State and its witnesses to describe M.C.’s allegations of

inappropriate touching by Defendant, was error. See Jamison, 2018 WL 6318321 at

*4; Dick, 126 N.C. App. at 315, 485 S.E.2d at 89. See also Oliver, 85 N.C. App. at 11,

354 S.E.2d at 533.

 C. Prejudicial Impact

 The erroneous admission of the witnesses’ repeated and improper use of

“disclosure” to bolster and vouch for M.C.’s credibility was prejudicial error to award

Defendant a new trial under plain error review.

 In State v. Ryan, this Court concluded and held that the following testimony

from a doctor admitted as an expert witness bolstered and improperly vouched for

the credibility of a child victim:

 [Prosecutor]. [H]ave you ever diagnosed or made a finding
 that [a] child is not being truthful?

 [Doctor]. I have done that on several occasions.

 [Prosecutor]. Can you explain to the jurors what you look
 for, the clues that you look for, and do you do that in every
 case?

 [Doctor]. I do it in every case.
 ....

 [Prosecutor]. Was there anything about your examination
 of [the child] that gave you any concerns in this regard?

 [Doctor]. That gave me concerns that she was giving a
 fictitious story?

 18
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 [Prosecutor]. Yes.

 [Doctor]. Nothing. There was nothing about the evaluation
 which led me to have those concerns. And again, as I was
 getting into her history and considering this as a
 possibility, nothing came out.

State v. Ryan, 223 N.C. App. 325, 334, 734 S.E.2d 598, 604 (2012), disc. review denied,

366 N.C. 433, 736 S.E.2d 189 (2013).

 This Court concluded the doctor’s testimony stating she had no “concerns” that

the child was giving “a fictitious story” was “tantamount to her opinion that the child

was not lying about the sexual abuse.” Id. As with Defendant here, the defendant in

Ryan did not object to the doctor’s admitted testimony. Id.

 This Court reviewed whether the admission of this disputed testimony

constituted plain error. Id. In assessing the doctor’s testimony, this Court prefaced

its analysis by stating:

 Notably, a review of relevant case law reveals that where
 the evidence is fairly evenly divided, or where the evidence
 consists largely of the child victim’s testimony and
 testimony by corroborating witnesses with minimal
 physical evidence, . . . the error is generally found to be
 prejudicial, even on plain error review, since the expert’s
 opinion on the victim’s credibility likely swayed the jury’s
 decision in favor of finding the defendant guilty of a sexual
 assault charge. See Aguallo, 318 N.C. at 599-600, 350
 S.E.2d at 82; State v. Trent, 320 N.C. 610, 615, 359 S.E.2d
 463, 466 (1987); State v. Bush, 164 N.C. App. 254, 259-60,
 595 S.E.2d 715, 718-19 (2004); State v. O’Connor, 150 N.C.
 App. 710, 712, 564 S.E.2d 296, 297 (2002); State v. Parker,
 111 N.C. App. 359, 366, 432 S.E.2d 705, 710 (1993).
 [Emphasis supplied].

 19
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

Id. at 337, 734 S.E.2d at 606.

 This Court further noted that the credibility of the child victim was central to

the State’s case in Ryan because:

 [T]he State’s evidence consisted of testimony from the
 child, her family members, her therapist, the lead detective
 on the case who was an acquaintance of the family, and an
 expert witness. All of the State’s evidence relied in whole or
 in part on the child’s statements concerning the alleged
 abuse. The only physical evidence presented that bolstered
 the State’s case that the child had been sexually abused
 was a deep hymenal notch in the child’s vagina and the
 presence of bacterial vaginosis. However, [the child’s
 mother] testified that the child’s symptoms of bacterial
 vaginosis predated the alleged sexual assaults by the
 defendant. In addition, more than two years had elapsed
 since the alleged sexual contact and the child’s medical
 examination. Further, there was no physical evidence that
 bolstered the State’s case that the child was anally
 assaulted or that defendant was the perpetrator of any
 such abuse. There was no testimony presented by the State
 that did not have as its origin the accusations of the child.

Id.

 In Ryan, all of the evidence presented by the State “amounted to conflicting

accounts from the child, defendant, and their families,” except for the erroneously

admitted testimony of the doctor, who had improperly vouched for the alleged child

victim’s testimony. Id. at 338, 734 S.E.2d at 607. This Court noted “[t]he child’s

account of what happened evolved over time[.]” Id. The Court concluded that, because

the doctor was admitted as an expert witness in the treatment of sexually abused

 20
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

children, “her opinion likely held significant weight with the jury” and “had a

probable impact on the jury’s finding defendant guilty by enhancing the credibility of

the child in the jurors’ minds.” Id.

 D. Absence of Other Evidence of Guilt - Motivation to Fabricate

 In other cases where defendants have: (1) admitted guilt; (2) physical evidence

was presented; (3) eyewitnesses testified they had observed defendants having sexual

or inappropriate contact with victims; or, (4) other properly admitted evidence

corroborated the allegations, this Court has found defendant’s showed insufficient

prejudice in improperly admitted vouching credibility testimony in child sex offense

cases to warrant a new trial on plain error review. See, e.g., State v. Crabtree, __ N.C.

App. __, __, 790 S.E.2d 709, 716-17 (2016) (holding the defendant had failed to show

prejudice under plain error review from erroneous admission of expert testimony

vouching for the victim where several eyewitnesses testified that they had observed

the defendant and the victim sexually touching each other on several occasions); State

v. Black, 223 N.C. App. 137, 146-47, 735 S.E.2d 195, 200-01 (2012) (holding the

defendant had failed to show prejudice under plain error review from the erroneous

admission of expert testimony vouching for the victim where other evidence showed

defendant had given the victim a vibrator, shaved the victim’s pubic hair, and

sexually molested other children); State v. Davis, 191 N.C. App. 535, 540-41, 664

S.E.2d 21, 25 (2008) (holding the defendant had failed to show prejudice under plain

 21
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

error review from the erroneous admission of a statement in expert’s report, which

bolstered victim’s credibility, where evidence showed the defendant’s sperm was

located on victim’s skirt).

 As distinguished from these cases noted above and similarly to the facts and

evidence in Ryan, the entire foundation of the State’s evidence here relies solely upon

M.C.’s uncorroborated allegations of indecent liberties taken by Defendant or other

acts of domestic violence. See id. No physical evidence or eyewitness testimony, or

prior reports or incidents or interventions recounted by M.C. was presented or

admitted to corroborate her accusations that Defendant had touched her

inappropriately or to support her other allegations of domestic violence had ever

occurred.

 In addition to M.C.’s uncorroborated and inconsistent accounts, other evidence

tended to show M.C. was motivated to fabricate her claims of inappropriate touching

against Defendant. In her trauma narrative, M.C. described the first time she had

met Defendant.

 Defendant had introduced himself to M.C. as Luck’s boyfriend. M.C. wrote

Luck had given Defendant a shirt for his birthday “and he opened it and he and my

mom started kissing. I felt mad because I started to think about my mom and dad

and I was afraid that [Defendant] and my mom would get married and I would have

to call him dad.”

 22
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 M.C. also testified she had told her mother she did not like Defendant staying

with them. M.C. recounted incidences of domestic violence between her mother and

Defendant in her testimony, forensic interview, and trauma narrative. None of these

alleged incidents were independently reported, corroborated or verified. M.C.’s stated

ill motivations against Defendant placed her credibility directly into issue.

 E. Inconsistent Allegations - Credibility

 M.C.’s “disclosures” and accounts of alleged indecent touching by Defendant

are inconsistent in the number of times, manner, and places Defendant allegedly

touched her and whether M.C. had informed her mother, grandmother, aunt, friends,

other family members, or teachers of the alleged incidences. These inconsistencies

further call her credibility into question and shows prejudice to Defendant from the

improper bolstering and vouching. Id. at 338, 734 S.E.2d at 607. A brief review is

instructive.

 DSS social worker Archie testified M.C. denied being touched inappropriately

by Defendant when Archie initially interviewed her on 25 October 2013. When Archie

interviewed M.C. a second time, in November 2013, M.C. “disclosed” and alleged only

one act of Defendant’s inappropriate touching. Defendant allegedly came into the

bedroom while M.C. was taking a nap, touched M.C. near her vagina, and walked

into the living room to watch television.

 23
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 M.C. told Archie that she had spoken with her mother, Luck, about the

incident. Luck allegedly responded for M.C. to tell her if it happened again. M.C. did

not recount this incident again to anyone else, either in her interviews with McSwain,

in her trauma narrative, with Mazzola, to Sergeant Prichard, or in her testimony at

trial.

 The next time M.C. alleged any indecent liberties were taken by Defendant,

occurred during McSwain’s forensic interview on 26 November 2013. M.C. “disclosed”

and described two incidences where Defendant had allegedly “made her feel

uncomfortable.”

 In the first incident, Luck asked M.C. to “get in the bed with her and

[Defendant].” M.C. was positioned in the bed between Luck and Defendant. Luck

got out of bed and went into the bathroom. While Luck was in the bathroom,

Defendant purportedly rolled over and started rubbing near M.C.’s vagina. M.C.

“disclosed” she rolled away from Defendant, fell off the bed, and hit her head on a

refrigerator next to the bed. Luck came out of the bathroom and asked “What was

that?” M.C. described Defendant to McSwain as pretending to be asleep. She was on

the floor crying and Luck picked her up and carried her to the living room couch.

 In the forensic interview, M.C. stated she told Luck about Defendant touching

her “private area” when they were at her “Aunt Tory’s house.” Luck’s alleged

response was, “Well, I guess he did it. And life has moved on.” M.C. initially indicated

 24
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

that the abuse “would always occur in the bedroom” at Luck’s home in the forensic

interview.

 In the second incident where M.C. “disclosed” in the forensic interview, she and

Defendant were sitting on the living room couch. Defendant allegedly reached inside

of her shirt and rubbed her chest. M.C. alleged this incident occurred while her

mother, Luck, was outside of the home, smoking a cigarette.

 The next version of M.C.’s allegations of inappropriate conduct by Defendant

are asserted within the trauma narrative she allegedly prepared as part of her

therapy with Mazzola. The writing and narrative appears well advanced beyond

M.C.’s age and education. M.C. “disclosed” three incidences asserting Defendant had

inappropriately touched her.

 In the first incidence, M.C. stated she became scared one night when she was

sleeping by herself in the living room. She went to Luck’s bedroom and told her she

did not want to sleep in the living room by herself. Luck told her she could sleep with

Luck and Defendant. Luck did not tell M.C. she had to sleep in the bed with her and

Defendant, as M.C. had told McSwain. M.C. laid between Defendant and Luck in the

bed. Defendant allegedly rolled over and put his hands inside her pants and touched

her private parts. Defendant then rolled over and went back to sleep.

 M.C. wrote she arose from the bed and pretended to go to the bathroom, but

instead went back to the living room to sleep. The next morning, Luck asked M.C.

 25
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

about her going back into the living room. M.C. told her “I thought I went to the

bathroom[.]” M.C. stated Luck responded with “I know you’re not telling me the

truth.” M.C. then wrote she told her mother about Defendant touching her “in the

private part last night.” Luck then called Defendant and got into an argument with

him about touching M.C. inappropriately. M.C. then wrote “And then we ate

breakfast and forgot about it for the day.”

 In this version, M.C. did not recount falling out of bed and hitting her head on

a refrigerator, her mother being in the bathroom, nor Defendant allegedly coming

into the living room afterwards and threatening to hurt her if she told anyone about

what had allegedly happened.

 The second incidence M.C. recounted in her trauma narrative occurred “[a]bout

two weeks later[.]” M.C. was sitting on the living room floor in front of the coffee

table. Defendant was reportedly helping M.C. with her homework and “he reached

over and put his hand inside [M.C.’s] shirt.” M.C. went to the bathroom and waited

until Defendant had left. She came out of the bathroom and told Luck about what

had happened. Luck “said she was going to call Grandma Sue and talk to her about

it. But we forgot about it again.”

 In the third incidence, M.C. said she had been taking a nap on the couch in the

living room. Luck was in the bathroom. “Defendant came over and put his hand in

[M.C.’s] pants and touched [her].” According to M.C.:

 26
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 My mom came out of the bathroom and [Defendant] rushed
 over to the recliner. I went back to sleep and when I woke
 up [Defendant] was acting weird. He was talking fast and
 he was shaky and acting like he did something wrong. He
 left and my mom asked me “Where did he touch you? and I
 told her “on my private part.” She got mad and went
 outside and told Grandma Sue and she got mad too. . . . the
 next day we forgot about it again. My mom never did
 anything about [Defendant], she didn’t care.

 F. Testimony at Trial

 The final time M.C. accused Defendant of inappropriately touching her was

during her direct testimony at trial. M.C. described the first incident had occurred

at a time when she was sleeping in the bed between Luck and Defendant. Luck got

out of bed and went to the bathroom. Defendant rolled over, wrapped his arm around

M.C., placed his hand inside of her pajama pants, and rubbed her vagina. M.C. was

eventually able to roll away from Defendant. M.C. initially testified she got out of

the bed and went into the living room.

 The prosecutor asked M.C. if she recalled anything else occurring before she

went into the living room, to which she replied, “I guess he was trying to stop me.

And. . . I kind of fumbled over. . . the mini refrigerator in the room. . . I fell out of the

bed and the refrigerator tipped over because I hit my head on it.”

 M.C. testified Defendant followed her into the living room and told her “that if

[she] told anyone, that he would hurt me.” M.C. stated her mother remained in the

bathroom when she fell out of bed and when Defendant followed her into the living

 27
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

room. M.C. testified she told her mother of the incident the next day, but her mother

responded that she “needed to move on with life.”

 M.C. testified Defendant had touched her vagina on a second occasion. She

stated, “we were in bed and my mom was asleep and I was in the middle of the bed

and [Defendant] had rolled over and did the same thing[,]” that is, rubbed her vagina.

M.C. testified she did not tell her mother nor anybody else about this incident. This

testimony was inconsistent with what she had written in her trauma narrative about

telling her mother the following morning and her mother getting into an argument

with Defendant over the alleged incident.

 The third, and final, incident M.C. testified to at trial involved Defendant

allegedly touching her chest underneath her clothes. M.C. stated, “[Defendant] was

sitting on the couch and I was at the coffee table sitting on the floor doing my

homework[.]” M.C.’s mother was in the kitchen cooking dinner. M.C. testified

Defendant “leaned over and put his hand in [M.C.’s] shirt” and “just kind of rubbed.”

M.C. stood up and Defendant took his hand out of her shirt. M.C. went to the

bathroom and waited. When she left the bathroom, Defendant was gone.

Inconsistent with what she had written in her trauma narrative, M.C. testified she

did not actually tell her mother about this incident.

 Aside from these three incidences, M.C. testified at trial that she did not recall

any other time when Defendant had touched her inappropriately, and Defendant had

 28
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

not touched her any other times either in the bedroom or living room. M.C. testified

she did not tell her maternal grandmother, Sue, or her school guidance counselor

about Defendant touching her, which testimony is inconsistent with what she had

“disclosed” to McSwain in her forensic interview. Neither Sue nor the school

guidance counselor testified at trial. M.C. did not testify about an incident when

Defendant had allegedly touched her vagina while she was taking a nap on the couch

in the living room, as she had described in her trauma narrative.

 The record shows many other inconsistencies in M.C.’s disparate recollections

of inappropriate touching by Defendant, a total lack of any physical evidence, a six-

to-eight month delay in “disclosing” the alleged indecent liberties and a lack of

eyewitness testimony or corroboration of the alleged incidences. The record also

includes evidence of M.C.’s motive to fabricate the allegations, due to disliking

Defendant because of his relationship with her mother.

 The State’s evidence and case is based entirely upon M.C.’s credibility. Neither

her mother, grandmother, roommate Michael, her aunt, school counselor nor anyone

else M.C. recounted as being present or having been contemporaneously told about

Defendant’s alleged acts of inappropriate touching testified. No physical evidence

was introduced, as was present in other cases.

 The State presented McSwain as an expert witness in the forensic interviewing

of abused children, and Mazzola as an expert witness in sexual abuse and pediatric

 29
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

counseling. The jury heard McSwain’s testimony involving his training in forensic

interviewing and his two Master’s degrees, including one in forensic psychology. The

jury heard Mazzola’s testimony involving her training in counseling, her Master’s

degree in social work, and how she had treated over 1,000 children for sexual abuse.

 Based upon their qualifications, McSwain and Mazzola’s expert testimonies

was likely given significant weight by the jury. Additionally, the improper use of

“disclosure” by all four of the State’s witnesses and prosecutor placed particular

significance upon the witnesses’ descriptions and interpretations of M.C.’s

statements. With the absence of any corroborative witnesses, documents, or physical

evidence, the witnesses’ improper bolstering testimony and vouching for M.C.’s

credibility was prejudicial to Defendant and had a probable impact upon the jury’s

finding of guilt. See Ryan, 223 N.C. App. at 338, 734 S.E.2d at 607.

 As with the State’s evidence in Ryan, the State’s case rested entirely on M.C.’s

accounts and allegations of what had occurred. See id. (holding admission of expert’s

improper vouching testimony constituted plain error where there was a lack of

corroborating evidence). Following our analysis and conclusion in Jamison and

holding in Ryan, the admission of the witnesses’ testimony, which improperly

vouched for M.C.’s credibility by referring to her statement’s alleging sexual abuse as

“disclosures” prejudiced Defendant, and constitutes plain error. See id. Defendant’s

 30
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

conviction and the judgment entered is properly reversed and remanded for a new

trial.

 V. The McSwain Report

 The majority’s opinion addresses Defendant’s argument regarding the trial

court’s admission of the “McSwain Report” into evidence. Defendant argues the “trial

court plainly erred because the opinions and recommendations in the [McSwain

Report] clearly establish McSwain found M.C. and her sexual abuse allegations

credible and believed in [Defendant’s] guilt.”

 As noted above, McSwain was tendered and admitted as an expert witness in

conducting forensic interviews of children. McSwain defined a “forensic interview”

as “a structured conversation with the child designed to elicit details about a specific

event or events that the child has . . . experienced.” McSwain prepared his Report,

which summarized information M.C. had “disclosed” or “revealed” to him during the

forensic interview, and his conclusions, opinions, and recommendations. After

Defendant’s initial objections, a redacted written McSwain Report was also admitted

into evidence.

 Defendant highlights numerous portions of the McSwain Report he contends

improperly bolster and vouch for M.C’s credibility, including the following sentences

within a section of the report, entitled “Impressions”:

 [M.C.] displayed age appropriate competencies across all
 spheres of functioning. [M.C.] appeared resistant to

 31
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 suggestion, unaffected by the primacy-recency effect, with
 appropriate memory recall and a willingness to correct the
 clinician as needed. . . . [M.C.] engaged appropriately in
 dialogue, stayed focused and followed commands. [M.C.’s]
 language skills. . . appeared appropriate for information
 gathering purposes. . . . [M.C.] demonstrated that she
 understood the difference between telling the truth and
 telling a lie. [M.C.] reported an acceptance of the obligation
 to report information truthfully. (Emphasis supplied).

 Defendant also casts the following paragraph from a section entitled

“Summary/Conclusion” as improper bolstering and vouching:

 The interviewe (sic) notes that during the forensic
 interview session, [M.C.] appeared to be consistent with
 the information . . . about [Defendant] sexually abusing
 her. In addition, she reported to being truthful and did not
 appear to display any overt signs of deception. [M.C.’s]
 assessment was consistent with that of someone who has
 been sexually abused. (Emphasis supplied).

 Defendant also contends the use of “assailant” in the following sentence from

a section entitled “Recommendations” in the Report constitutes an improper comment

upon Defendant’s guilt:

 2. The interviewer would strongly encourage that [M.C.]
 remain inaccessible to the alleged assailant until the
 reasonable conclusion to this investigation and
 determination is made that [M.C.] is emotionally and
 physically safe when in the assailant’s presence[.]

 With regards to the “Summary/Conclusion” section of the McSwain Report,

this Court has held very similar expert testimony constitutes improper vouching for

the credibility of a witness and was erroneously admitted in State v. Frady, 228 N.C.

 32
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

App. 682, 747 S.E.2d 164, disc. review denied, 367 N.C. 273, 752 S.E.2d 465 (2013).

 In Frady, a medical doctor, Dr. Brown, was admitted as an expert witness and

testified that a six-year-old child, Debbie’s, “disclosure” was “consistent with sexual

abuse.” Id. at 684, 747 S.E.2d at 166. Dr. Brown testified that her opinion was based

upon “[t]he consistency of [the child’s] statements over time, the fact that she could

give sensory details of the event . . . and her knowledge of the sexual act that is beyond

her developmental level.” Id. (original alterations omitted).

 This Court stated:

 In order for an expert medical witness to render an opinion
 that a child has, in fact, been sexually abused, the State
 must establish a proper foundation, i.e. physical evidence
 consistent with sexual abuse. Without physical evidence,
 expert testimony that sexual abuse has occurred is an
 impermissible opinion regarding the victim’s credibility.

Id. at 685, 747 S.E.2d at 1667 (emphasis supplied) (citation omitted).

 Reviewing Dr. Brown’s testimony, this Court held that:

 [w]hile Dr. Brown did not diagnose Debbie as having been
 sexually abused, she essentially expressed her opinion that
 Debbie is credible. We see no appreciable difference
 between this statement and a statement that Debbie is
 believable. The testimony neither addressed the
 characteristics of sexually abused children nor spoke to
 whether Debbie exhibited symptoms consistent with those
 characteristics.

Id. at 685-86, 747 S.E.2d at 167 (citation omitted).

 This Court held “the contested testimony amounted only to an impermissible

 33
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

opinion regarding the victim’s credibility, and the trial court erred in admitting it.”

Id. at 686, 747 S.E.2d at 167; see also Oliver, 85 N.C. App. at 11, 354 S.E.2d at 533.

 The State argues Frady is inapplicable to support Defendant’s appeal because,

unlike McSwain, Dr. Brown did not personally interview the child victim. This Court

noted “the record contains no physical evidence indicating that Debbie was sexually

abused, and Dr. Brown never personally examined or interviewed her; she merely

reviewed the forensic interview and the case file.” Frady, 228 N.C. App. at 686, 747

S.E.2d at 167.

 A close reading of this Court’s analysis indicates Dr. Brown’s failure to

interview or personally examine the child was not a determinative factor of this

Court’s holding that her testimony constituted inadmissible opinion testimony

vouching for the child’s credibility. Id.

 Before noting Dr. Brown had not personally interviewed or examined the child,

this Court held Dr. Brown “essentially expressed her opinion that Debbie is credible.

We see no appreciable difference between this statement and a statement that Debbie

is believable.” Id.

 Even if Dr. Brown had personally interviewed or examined the child, no

testimony established her opinion that the child’s “‘disclosure’ is consistent with

sexual abuse” was based upon a comparison of the victim’s characteristics to the

known characteristics of sexually-abused children. Id. at 685, 747 S.E.2d at 166.

 34
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 In Frady, this Court held the doctor’s expert testimony, concerning her opinion

on the credibility of the child, was not dependent upon whether that doctor had

interviewed or examined the child witness. In the present case, the State’s

characterization and limiting of this Court’s holding in Frady is inconsistent with

that opinion’s analysis. See id.

 No meaningful distinction exists between the expert testimony excluded in

Frady and the “Summary/Conclusion” paragraph challenged in the McSwain Report.

McSwain based his conclusion asserting “[M.C.’s] assessment was consistent with

that of someone who has been sexually abused” upon his opinion that “[M.C.]

appeared to be consistent with the information . . . about [Defendant] sexually

abusing her” and “she reported to being truthful and did not appear to display any

overt signs of deception.”

 Like the inadmissible testimony in Frady, this paragraph in the McSwain

Report “essentially expresse[s] [his] opinion that [M.C.] is credible.” See Frady, 228

N.C. at 685, 747 S.E.2d at 167. Following our opinion in Frady, I “see no appreciable

difference between [McSwain’s] statement and a statement that [M.C.] is believable.

The [statement] neither addressed the characteristics of sexually abused children nor

spoke to whether [M.C.] exhibited symptoms consistent with those characteristics.”

See id. at 686, 747 S.E.2d at 167.

 35
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

 The “Summary/Conclusion” section from the McSwain Report constitutes

inadmissible expert testimony attesting to the credibility of M.C. See In re T.R.B.,

157 N.C. App. 609, 617, 582 S.E.2d 279, 285 (2003) (“An expert witness may not attest

to the victim’s credibility, as he or she is in no better position than the jury to assess

credibility.”).

 VI. Invited Error

 The majority’s opinion correctly concludes Defendant cannot show plain error

with respect to the erroneous admission of any portion of the McSwain Report on this

appeal. Based upon Defendant’s invited error, I concur with the majority’s opinion

that he is unable to establish plain error on the otherwise erroneous, but invited

admission of the McSwain Report on this ground.

 VII. Conclusion

 Defendant’s arguments concerning the erroneous admission of the McSwain

Report are waived. Based upon Defendant counsel’s invited error, I concur with the

majority’s opinion that Defendant cannot to establish plain error on this ground.

 The State’s case rested entirely upon M.C’s credibility and lacked any

corroborating physical evidence or independent testimony. The trial court’s

admission of bolstering testimony by McSwain, Mazzola, Archie, and Sergeant

Prichard to vouch for M.C.’s credibility was error. The witnesses’ bolstering

testimony likely had a probable impact on the jury’s verdict, given the shifting and

 36
 STATE V. BETTS

 TYSON, J., concurring in part and dissenting in part

inconsistent versions of alleged incidents M.C. “disclosed” and motivations for M.C.

to fabricate against and prejudice Defendant.

 The State’s introduction of alleged domestic violence by Defendant, without

any corroborating evidence, was also error. These errors are prejudicial and

constitute plain error. Plain error and the cumulative effect of the errors at trial

prejudiced Defendant, and necessitates reversal.

 I vote to reverse Defendant’s conviction and judgment and remand for a new

trial. I concur in part and respectfully dissent in part.

 37